WILLIAM M. DONALD et al., appellants,

*v.*

AMERICAN SMELTING AND REFINING COMPANY et al., respondents.

[Filed April 8th, 1901.]

1. Under section 49 of our Corporation act (*P. L. of 1896 p. 277*), when an original issue of corporate stock for property to be purchased is contemplated, it is the duty of the directors to see that the real value of the property is at least equal to the face value of the stock.

2. Before an original issue of corporate stock for property to be purchased takes place, the *bona fide* judgment of the directors as to the value of the property, while it is entitled to considerable weight, is not conclusive, but may be reviewed at the instance of existing stockholders; and if, on such review by a court of equity, the value of the property appears to be less than the face value of the stock, the issue should be restrained.

3. After stock has been issued as full-paid stock for property purchased, the judgment of the directors as to the value of the property becomes conclusive, in the absence of actual fraud in the transaction, and such stock is not liable to any further call.

4. An increase of corporate stock, voted for by the board of directors and by the requisite majority of stockholders, in order to issue such stock for property worth less than the face value of the stock, should be restrained at the instance of dissenting stockholders.

On appeal from an order advised by Vice-Chancellor Stevens, whose opinion is reported in *16 Dick. Ch. Rep. 458.*

Mr. *Richard V. Lindabury,* Mr. *Eugene Treadwell* and Mr. *Edward Lauterbach* (of New York), for the appellants.

Mr. *William H. Corbin,* Mr. *Samuel Untermeyer* and Mr. *Thomas Thatcher* (of New York), for the respondents.

The opinion of the court was delivered by

DIXON, J.

The bill in this case was presented by several holders of stock in the American Smelting and Refining Company to enjoin the company and its directors from entering into a contract with M. Guggenheim's sons for (1) the transfer to the company of the smelting and refining plants, appurtenant property and business of that firm; (2) the payment by the firm to the company, in cash or in working capital, of a sum equal to two-thirds of the company's working capital on January 1st, 1901, said to be about $6,000,000, and (3) the payment by the firm to the company of the further sum of $6,066,666.66 in cash; and for the issuance and delivery to the firm by the company of $45,200,000 in aggregate par value of the company's capital stock, one-half thereof preferred and one-half common; and also to enjoin them from increasing the capital stock of the company from $65,000,000 to $100,000,000, in order to use the added $35,000,000, with $10,200,000 of its originally authorized capital stock still held by the company for the carrying out of such bargain.

On filing the bill and accompanying affidavits an order to show cause and stay were granted by the chancellor, which, on the coming in of the answer and its accompanying affidavits, were discharged. Thereupon the complainants appealed to this court, and having secured from us a stay pending the appeal, brought on for hearing the application for an injunction *pendente lite.*

The controversy in its present stage turns upon the charge of the complainants, that the cash and property to be acquired by the company are not worth the par value of the stock to be issued therefor, and hence that the transaction contemplated is illegal.

The rule to be applied in determining whether on such a contention a contemplated original issue of corporate stock is legal or not, is prescribed by sections 48 and 49 of our Corporation act. *P. L. of 1896 p. 277.* They run as follows:

"48. Nothing but money shall be considered as payment of any part of the capital stock of any corporation organized under this act, except as hereinafter provided in case of the purchase of property.

"49. Any corporation formed under this act may purchase mines, manufactories or other property necessary for its business, or the stock of any company or companies owning, mining, manufacturing or producing materials or other property necessary for its business, and issue stock to the amount of the value thereof in payment therefor."

The meaning of section 48 is not questionable. The money must equal the face value of the stock. The language of section 49 is even more explicit. The corporation may issue stock *to the amount of the value* of the property. The value of the property in the one case, just as the value of the money in the other, must at least equal the face value of the stock. Such was the view expressed for this court by Mr. Justice Depue in *Wetherbee* v. *Baker, 8 Stew. Eq. 501,* and supported by abundance of authority.

The distinction between the contemplated issue of corporate stock for property and its issue for money lies, not in the rule for valuation, but in the fact that different estimates may be formed of the value of property. When such differences are brought before judicial tribunals, the judgment of those who are by law entrusted with the power of issuing stock "to the

amount of the value of the property," and on whom, therefore, is placed the first duty of valuing the property, must be accorded considerable weight. But it cannot be deemed conclusive when duly subjected to judicial scrutiny. Nor is it necessary that conscious overvaluation or any other form of fraudulent conduct on the part of these primary valuers should be shown to justify judicial interposition. Their honest judgment, if reached without due examination into the elements of value, or if based in part upon an estimate of matters which really are not property, or if plainly warped by self-interest, may lead to a violation of this statutory rule as surely as would corrupt motive.

The cases in this state to which we are referred (*Elkins* v. *Camden and Atlantic Railroad Co., 9 Stew. Eq. 241; Park* v. *Grant Locomotive Works, 13 Stew. Eq. 114; Ellerman* v. *Chicago Junction Railway Co., 4 Dick. Ch. Rep. 217; Willoughby* v. *Chicago Junction Railway Co., 5 Dick. Ch. Rep. 656; Sewell* v. *East Cape May Beach Co., 5 Dick. Ch. Rep. 717; Edison* v. *Edison United Phonograph Co., 7 Dick. Ch. Rep. 620*) in support of the proposition that the honest judgment of the managers of a corporation, with respect to matters *intra vires,* cannot be disturbed at the instance of stockholders; all relate to transactions for which the legislature has set up no other criterion than the discretion of those managers. But the original issue of corporate stock is a special function, in the exercise of which the legislature has fixed the standard to be observed, and it is the duty of the courts, so far as their jurisdiction extends, to see that this standard is not violated, either intentionally or unintentionally.

When corporate stock has once been issued for property purchased, then the legislature has directed the application of a different rule. In the words of the same section 49,

"the stock so issued shall be full-paid stock, and not liable to any further call, neither shall the holder thereof be liable for any further payment under the provisions of this act; and in the absence of actual fraud in the transaction the judgment of the directors as to the value of the property purchased shall be conclusive."

Under these provisions, after the property has been purchased and the stock issued therefor, nothing short of *actual fraud in the transaction* can impair the right of the holder to hold his stock as full-paid stock, free from further call. The cases of *Bickley* v. *Schlag, 1 Dick. Ch. Rep. 533,* and *Rural Homestead Co.* v. *Wildes, 9 Dick. Ch. Rep. 668,* indicate that the completed transaction was equally secure, even before the statute received its present decisive form.

By the rule above stated, then, the matter in hand must be judged.

The evidence before us shows that in the bargain projected M. Guggenheim's Sons were to give, for $45,200,000 of stock, about $12,000,000 in cash in working capital, their plants at Perth Amboy, New Jersey; at Pueblo, Colorado; at Aguas Calientes and Monterey, Mexico, and somewhere in South America, and their leases and contracts, the nature of which is not disclosed in these proceedings. Regarding "the cash and working capital" as so much money, and setting it off against an equal amount of stock, there remains about $33,000,000 of stock to be equivalenced by the property purchased. It is substantially admitted that the value of the plants themselves as physical possessions does not exceed $10,000,000, thus leaving about $23,000,000 to be made up in the value of the good-will of the business and the leases and contracts mentioned.

The defendants insist that the complainants have not borne the burden cast upon them by law of proving that these items are not worth that sum, and certainly we would be unwilling now to adjudge that such a negative is established. But it must be remembered that the cause is yet in a preliminary stage; that the complainants have shown the value of everything which they could reasonably be expected to discover before instituting their suit; that the directors are their trustees, and are intending a very large issue of stock for property which they have not seen fit hitherto to define. Under these circumstances, the legal rule imposing the burden of proof on the complainant should not be rigorously applied. Indeed, as these trustees are seeking to exercise a specially delegated power, which can be justly exercised only in accordance with a prescribed standard, it is not

entirely clear that a burden does not rest on them, when challenged beforehand, to vindicate their proposed action. But assuming the burden to be on the complainants, we think that for present purposes it is sustained.

The proofs point strongly to the conclusion that in the negotiations between the parties the real value of the property to be acquired has not been the basis on which they have determined the amount of stock to be issued therefor. This is explicitly stated in the affidavit annexed to the answer made by Daniel Guggenheim, who had entire charge of the negotiations on behalf of his firm. He said:

"From the outset the purpose of both parties was to reach a just conclusion as to *comparative values,* and to determine on that basis what amount of the securities we would justly receive for our business and properties as against those of the American company, represented by its outstanding $54,800,000 of stock."

In other words, on the assumption that the possessions of the company are worth $54,800,000, the parties concluded that what the firm was to deliver to the company is worth $45,200,000. This mode of arriving at the value of property to be purchased by the issue of stock is not that contemplated by the statute, and can be made to accord with it only by proof that the assumption is well found. But there is no support for the assumption above stated, except the general averment that the company's net earnings for the year ending October 31st, 1900, exceed $4,500,000, *i. e.,* about eight and a half per cent. of the par value of its outstanding stock, and the fact that the shares of that stock are fully paid. The earnings of a single year hardly afford satisfactory evidence of the value of the company's property, and whether the shares are "fully paid" merely because they were issued for property purchased, without the presence of fraud in the transaction, and whether the consideration received for them has depreciated since the company was organized in April, 1899, we have not the means of knowing. What the defendants have taken care to show to the court, though for another purpose, is that the commercial world has never, until the proposed bargain came into view, estimated the stock of the company at more than two-thirds of its face value.

The fact just mentioned underlies another position taken by the defendants, viz., that the contemplated contract would be advantageous to the company and its stockholders, since even the mere expectation that it would be consummated has increased the value and market price of the stock, and, therefore, it is argued, the complainants, as stockholders, are not aggrieved. But not there is the pith of the controversy. If the intrinsic value and market price of the company's stock were only sixty per cent. of its face, and an outsider were to offer eighty per cent. in money for additional stock to be issued, such an offer would clearly be advantageous to the company and its stockholders; but it could not be legally accepted, because the legislature has required that one hundred per cent., whether in cash or in property, shall be received for corporate stock when originally issued. It is the illegality of the transaction which warrants complaint. Stockholders have the same right to prevent an issue of stock in violation of the statute as they have to prevent a use of corporate property beyond the scope of the corporate power, without regard to loss or gain. *Pom. Eq. Jur.* §§ *1093, 1095.*

In view of the undefined nature of the property for which $23,000,000 of stock is to be issued, of the illegitimate basis on which the price to be paid for that property appears to have been fixed, and of the probability that the stock has been rated by the parties at its market value rather than at par, we think proper ground is shown for restraining the completion of the contract until full investigation can be made.

With regard to the mere act of increasing the capital stock, the defendants contend that, as the board of directors and two-thirds of the stockholders have voted in favor of the increase, the court cannot interfere. But evidently this act of the corporate authorities must stand on the same footing as other corporate doings. The fact that in making an increase of stock two-thirds of the stockholders have concurred with the board of directors, does not relieve their action from the rule that corporate bodies must keep within the legislative bounds of their authority, with respect to their ends as well as to their means. They cannot be justified in an attempt to increase the capital

stock for an illegitimate object, *e. g.,* to found a charity, or in order to issue the stock for less than par. But if the claim of these complainants shall ultimately prove well founded, this proposed increase has been favored for the purpose of so issuing it, and with no other design. The circular letter sent out by the directors to the stockholders to secure their assent to the increase expressly declared that the object was to effectuate the contemplated bargain with M. Guggenheim's Sons. If the stock can lawfully be used for that purpose, the stockholders have assented to the increase and the complainants must acquiesce, but if it cannot, then it would be utterly inequitable, not only to the complainants, but also to the stockholders who have voted for it, to hold that authority for the increase has been properly given.

The proceedings to increase the stock should likewise remain in *statu quo.*

COLLINS, J. (dissenting).

The affidavits submitted by the complainants were limited to the cost of reproduction of certain smelting and refining works specified and were largely based on common report. No attempt was made to place a value upon all the "smelting and refining plants, appurtenant property and business" of the firm of M. Guggenheim's Sons as a going concern, and there is no charge or proof that information on that subject was ever denied or even asked. The answer filed made all discovery prayed, and there is nothing in that answer or the accompanying affidavits inconsistent with the statutory requirements as to the issue of stock. It does indeed appear that M. Guggenheim's Sons were influenced, in deciding to sell their property for the price agreed on, by a comparison of the values of the two interests, to be in effect consolidated, as applied to the total stock issue that would eventually represent those interests, but it does not follow that actual values are below the face of the stock. The defendants were not, in my opinion, called on to prove anything on the subject, but it does appear from the affidavits they submitted that on the legitimate basis of earning power the stock values are actual values. I attach no importance to the exchange quo-

tations of the stock of the defendant company. The price secured for such of the stock of new corporations, especially those of an industrial character, as gets into the general market affords very little indication of real value.

I think that the complainants failed to prove, *prima facie,* any charge in their bill, and shall therefore vote to affirm the order denying them an injunction, and I am authorized to say that the other judges so voting concur in this opinion.

*For reversal*—THE CHIEF-JUSTICE, VAN SYCKEL, DIXON, GARRISON, HENDRICKSON, ADAMS, VREDENBURGH, VOORHEES, VROOM—9.

*For affirmance*—GUMMERE, COLLINS, FORT, GARRETSON, BOGERT—5.