Warren GOLDEN, Plaintiff
and Appellant,

v.

OAHE ENTERPRISES, INC., a South Da-
kota Corporation, Donald F. Emmick,
Individually and as a Director and Presi-
dent of Oahe Enterprises, Inc.; and,
Robert Emmick, Individually and as a
Director and Secretary of Oahe Enter-
prises, Inc., Defendants and Appellees.

No. 12583.

Supreme Court of South Dakota.

July 23, 1980.

Rehearing Denied Aug. 29, 1980.

R. G. Schmidt of Schmidt, Schroyer & Colwill, P. C., Pierre, for plaintiff and appellant.

Glen H. Johnson of Banks & Johnson, Rapid City, for defendants and appellees.

WOLLMAN, Chief Justice.

## FACTS

This is the fourth appeal to this Court from litigation between these parties concerning the assets of Oahe Enterprises, Inc. (Oahe). In *Oahe Enterprises, Inc. v. Golden*, 88 S.D. 296, 218 N.W.2d 485 (1974), the appeal was dismissed because we concluded that the order appealed from was not appealable. We indicated in that case, however, that Warren Golden (Golden) was entitled to receive 338.446 shares in Oahe. In *Golden v. Oahe Enterprises, Inc.*, 90 S.D. 263, 240 N.W.2d 102 (1976), two appeals were combined and several issues were addressed at length. In that opinion, we ordered that Oahe be dissolved and that an accounting of the corporation's financial affairs be made to Golden with a pro rata distribution of the proceeds of the corporation to be made between Golden and the sole remaining stockholder, Donald Emmick (Emmick). The remand also required the trial court to examine the merits of Golden's allegations of wrongful appropriation of the corporate assets by Emmick and to examine the issues of fraud and the extent of actual and exemplary damages resulting therefrom. The present appeal is brought by Golden, alleging, among other things, that the trial court applied the wrong standard of proof concerning the issue of fraud and erred in its treatment of certain loans made for the purchase of the corporate assets, and finally, that the trial court failed to award the proper attorney fees. We reverse and remand.

Because the prior opinions of this Court dealt with only part of the factual history involved and because heretofore the corporation was an ongoing entity producing constantly changing relationships, the labyrinthian facts of this dispute that has continued now in excess of twelve years have never been fully set forth.

Emmick is the major figure in the story of Oahe. In years past, Emmick has been involved in the sale of industrial chemicals, the promotion of nursing homes, and the management of various farming activities. Emmick approached one J. B. Morris (now deceased) with a plan whereby Morris' Sully County, South Dakota, ranch would be incorporated and through Emmick's managerial skills made to show a profit. At approximately the same time, Emmick approached Golden, who was then operating the Silver Spur Bar in Ft. Pierre, and proposed that Golden contribute some farm machinery and livestock to Oahe. Golden was not, however, present on October 26, 1966, when Oahe was incorporated at a meeting in the office of George Qualley, Emmick's lawyer, in Sioux City, Iowa.

At this meeting, it was concluded that Oahe shares would be given a $50 par value. Officers of the corporation were elected: Chairman and Secretary-Treasurer, J. B. Morris; President, Emmick; and Vice-President, Milton Morris (J. B. Morris' son). An agreement was signed whereby J. B. and Mary Morris transferred their ranch to Oahe Enterprises. It was concluded that the Morris ranch was worth $168,000.00. Of this amount, Morris' equity was determined to be $120,000.00. As his contribution, Emmick transferred 6,315 shares of Colonial Manors, Inc., stock (CM stock) to Oahe.

Colonial Manors, Inc., is an Iowa corporation that is involved in the promotion and management of nursing homes throughout the Midwest. There is serious disagreement concerning the value this stock had at the time Emmick exchanged it for Oahe stock. Emmick represented to the Morrises that the stock was worth $19 per share. At the March 1966 meeting of the CM Corporation, the board of directors set the value of CM stock for internal stock-option purposes at $19 per share. This figure represented

$1 for each nursing home the CM Corporation was involved with. At the September 1966 meeting, the value of the CM stock was reduced by the board of directors to $9.50 per share. Emmick knew of the reduction in value of the CM stock prior to the October 26, 1966, meeting at which Oahe was incorporated. There is, however, no evidence that would suggest that this knowledge was disclosed to the Morrises.

Oahe then commenced ranching operations under Emmick's management. In October 1966,[1] Golden agreed to transfer various items of equipment to Oahe in exchange for shares in the corporation. Golden was elected secretary-treasurer of the corporation and together with his wife attempted to do the bookkeeping for Oahe. At one point, Emmick asked the Goldens to produce a balance sheet that he might present to a local lending institution in order to procure loans for the corporation. The Goldens refused to produce this balance sheet unless they were allowed to examine all of the books of Oahe Corporation. Emmick refused this request. This long series of lawsuits then began.

By 1970, Emmick and a Mr. Danbury held between them all of the shares of Oahe, except Golden's shares. They did not consider Golden to be a shareholder. Golden was excluded from all meetings of Oahe and was not informed of the final transaction in which the assets of Oahe were transferred to one Charles Cannon III (Cannon).

Cannon was in the process of establishing a large ranch in South Dakota. During this process, he acquired substantial holdings lying on both sides of the Oahe ranch. Originally, Emmick and Cannon discussed the possibility of merging the Oahe ranch with the Cannon holdings to establish one corporation, of which Emmick would be part owner. For tax reasons, however, Cannon needed to make a large purchase. Accordingly, he set out to buy the Oahe ranch.

It was arranged that Emmick would acquire all the outstanding shares of Oahe and would then transfer the assets of the corporation—which consisted primarily of the ranch—to Cannon for approximately $770,000. Cannon advanced Emmick $150,000 of the purchase price, in part to allow Emmick to purchase Danbury's 2,366 shares of Oahe. Emmick also used part of the loan proceeds from Cannon to pay off various debts of the corporation, in addition to making a substantial down payment on the Danbury shares. These shares were then placed in escrow and the voting rights immediately transferred to Emmick. The result of this was to make Emmick the sole owner of Oahe, except for Golden's 338.446 shares. The anticipated sale then occurred, and Cannon paid the purchase price to Oahe. Included within the Cannon payment was an assignment to Oahe of the $150,000 note given by Emmick to Cannon.

The trial court found that the Cannon-Emmick advance was a personal loan to Emmick and that upon final dissolution of the corporation Emmick would owe the $150,000 to Oahe. The trial court did not, however, allow any adjustment for the more than $50,000 of the loan that Emmick used to pay off corporation debts.

The trial court found that upon final dissolution there were 5,070.446 shares of Oahe outstanding and that Oahe's total net worth available for distribution to Emmick and Golden was $693,354.44. The court found that Golden owned 338.446 shares of Oahe. Pro rata distribution of the Oahe assets would give Golden 6.675 percent, or $46,281.41, and Emmick 93.325 percent, or $647,073.03. This result occurs because the trial court granted Emmick the option of retaining in his own name the 2,366 shares purchased from Danbury and owing the corporation $132,675 as the balance of the purchase price on the shares, or considering those shares to be corporate shares and canceling them.

---

1. Finding # 9 states that there was conflicting testimony about when this transfer was negotiated. *Golden v. Oahe Enterprises, Inc.*, 90 S.D. 263, 240 N.W.2d 102 (1976), says the property was transferred in January 1967. Golden's deposition says he agreed to transfer the property in October 1966, and that the property was actually transferred on January 6, 1967.

## I

### Valuation of the CM Stock Exchanged for Oahe Stock

As we interpret it, Golden's real complaint is that Emmick was allowed to use as the value of his CM stock a value arbitrarily affixed by the CM board of directors for a strictly internal purpose—that of raising badly needed funds for CM by offering stock options at a desperate juncture in its corporate life. This value admittedly bore no relationship to the book value of CM stock, which the trial court found to be forty-seven cents per share. Emmick admitted that he used for his valuation of CM stock the internal stock option price set by the CM board of directors. Yet when that same board reduced the CM stock option price to $9.50 per share on September 16, 1966, a fact Emmick knew, this reduction was not reflected in the value Emmick set on the CM shares transferred into Oahe a month and a half later.

SDCL 47–3–29 provides: "In the absence of fraud in the transaction, the judgment of the board of directors or the shareholders, as the case may be, as to the value of the consideration received for shares shall be conclusive." Prior to the enactment of SDCL 47–3–29, the comparable section of our Code read:

> When property is taken by the corporation in consideration for capital stock of the corporation, the judgment of the board of directors, made in good faith, and entered in the minutes of the corporation, shall be conclusive as to the value of such property.

SDC 1960 Supp., § 11.0301. This provision was carried over from R.C. 1919 § 8775, alluded to in *Ipswich Printing Co. v. Engler*, 63 S.D. 396, 259 N.W. 497 (1935). The change in 1965 from the good faith test to the absence of fraud test is derived from Section 19 of the Model Business Corporation Act, drafted by the American Bar Association's Committee on Corporate Laws. The committee's comment following this section states:

> The third paragraph of section 19, dealing with valuation, adopts the "absence of fraud" rule. . . . A court might well reach the same result under the "absence of fraud" rule as under the "good faith," "reasonable judgment" or "actual fraud" rules. . . .

Model Bus.Corp. Act Ann.2d, § 19 ¶ 2 at 436.

In *Lloyd v. Preston*, 146 U.S. 630, 13 S.Ct. 131, 36 L.Ed. 1111 (1892), the Supreme Court held that the overvaluation of property exchanged for corporate stock, even though such valuation was ratified by the corporation's board of directors, established fraud and entitled complaining creditors to enforce full payment from the transferor for the stock issued him.

In *Donald v. American Smelting & Refining Co.*, 62 N.J.Eq. 729, 48 A. 771 (1901), the court in construing language similar to that in SDCL 47–3–29 stated:

> different estimates may be formed of the value of property [exchanged for stock]. When such differences are brought before judicial tribunals, the judgment of those who are by law intrusted with the power of issuing stock "to the amount of the value of the property," and on whom, therefore, is placed the first duty of valuing the property, must be accorded considerable weight. But it cannot be deemed conclusive when duly subjected to judicial scrutiny. Nor is it necessary that *conscious overvaluation or any other form of fraudulent conduct on the part of these primary valuers* should be shown, to justify judicial interposition. *Their honest judgment, if reached without due examination into the elements of value . . . or if plainly warped by self-interest*, may lead to a violation of this statutory rule, as surely as would corrupt motive. . . . [I]t is the duty of the courts . . . to see that this standard is not violated, either intentionally or unintentionally.

48 A. at 772–3 (emphasis supplied). We believe that this approach should be applied to the case at bar.

■ Courts faced with the situation in which a promoter benefits from a violation

of his fiduciary duty at the expense of the corporation or its members often characterize the promoter's gain as "secret profit." Such profit is not secret if all interested parties know of and assent to it. But where a promoter through, for example, overvaluation of property exchanged for stock and failure to disclose all material facts regarding such exchange, takes more from the corporation than he transfers in, he is held liable for what courts term secret profit. *Lomita Land & Water Co. v. Robinson*, 154 Cal. 36, 97 P. 10 (1908); *Old Dominion Copper Mining & Smelting Co. v. Bigelow*, 203 Mass. 159, 89 N.E. 193 (1909); *Koppitz-Melchers, Inc. v. Koppitz*, 315 Mich. 582, 24 N.W.2d 220 (1946); *Thompson v. Walker*, 253 Mich. 126, 234 N.W. 144 (1931).

■ As a promoter of Oahe, Emmick stood in a fiduciary relationship to both the corporation and its stockholders and was bound to deal with them in the utmost good faith. "The obtaining of a secret profit by a promoter through the sale of property to a corporation is uniformly held to be a fraud on the corporation and stockholders, and the promoter may be required to account for such profit."[2] Annot., 84 A.L.R.3d 163, 164, § 2[a] (1978).

The valuation of the CM stock was based on Emmick's self-serving estimate of matters well known to him as a CM insider and was warped by Emmick's self-interest. Emmick was not trading stock that had an easily ascertainable value; he was not dealing with people experienced in transactions of this type. He failed to make known facts of which he, as an insider of CM, was aware. It is true that Emmick was not the only member on the Oahe board of directors. He was, however, the controlling member and the one in possession of information pertinent to the value of his CM stock not generally available to the public or to the other Oahe board members. In addition to being an insider of CM, he was both a director of and the dominant and controlling force in Oahe. We hold, therefore, that he failed in his duty to the corporation to disclose information regarding stock he intended to transfer into Oahe for Oahe shares and is therefore liable for the shortfall to the corporation therefrom.

■ We conclude that the CM stock that Emmick transferred into Oahe was greatly overvalued at its $19.00 per share figure. We do not consider the $19.00 per share figure affixed by Emmick to be supported by credible evidence in the record, nor do we find it to be indicative of the true value of CM stock at the time of transfer, all factors considered.[3] Nothing in the record indicates that Emmick knew at the time of the transfer whether any sales of CM stock in 1966 had actually occurred, nor did Jerry Jackson, a fellow CM associate, indicate that Emmick knew of any sales Jackson made in 1966. The certified public accountant who helped prepare the receiver's report advised the court that it should take judicial notice that the CM stock was watered or fictitiously increased at the time of the exchange. Further, the trial court found that valuation of the stock by the CM Board of Directors "was substantially based on future growth and profit." Article XVII, § 8 of the South Dakota Constitu-

**2.** The proper burden of proof in a fraud action is preponderance of the evidence, not the clear and convincing standard apparently applied by the trial court. *Gen. Elec. Credit Corp. v. M. D. Aircraft*, 266 N.W.2d 548 (S.D.1978); *Aschoff v. Mobil Oil Corp.*, 261 N.W.2d 120 (S.D.1977). Emmick argues that although the memorandum opinion states that the appropriate test is clear and convincing evidence, nothing in the court's findings of fact or conclusions of law says that clear and convincing evidence was the standard of proof used by the court. The trial court, however, expressly included and incorporated all findings and conclusions made in its memorandum opinion. Thus the wrong standard of proof appears to have been applied by the trial court.

**3.** The trial court found that at the time of the transfer, CM stock had a book value of forty-seven cents per share, and that its stock option price was $9.50 per share; the receiver's report indicated that the average selling price of all original stock ever issued by CM was $1.71 per share. Testimony of a certified public accountant indicated the CM's adjusted book value was thirty-nine cents per share. Average selling price of CM stock in 1966, according to the court-appointed receiver, was $13.34 per share.

tion[4] prohibits the use of future or potential value for purposes of valuing property exchanged for corporate stock. Value based on future potential is speculative and arbitrary. *Thompson v. Commonwealth Finance Corp.*, 46 S.D. 141, 191 N.W. 447 (1922). Statutory authorization for the issuance of stock in exchange for property does not permit the issuance of stock for property that is overvalued or is worth substantially less than the par value of the stock. *Gamble v. Queen's County Water Co.*, 123 N.Y. 91, 25 N.E. 201 (1890); *Frey v. Geuder, Paeschke & Frey Co.*, 4 Wis.2d 257, 90 N.W.2d 765 (1958); 18 Am.Jur.2d *Corporations* § 259 (1965). It is the cash value of the exchanged property, not its future value or the hopes or expectations or the prospects of future value, that must be taken as the basis for exchange. 18 Am.Jur.2d, supra, § 262, at 784. Accordingly, we conclude that the trial court erred insofar as it allowed future, potential or speculative value to determine the value assigned to the CM stock.

■ Because the total value of the CM stock Emmick transferred to Oahe was less than the value Emmick received in Oahe stock, the difference can be equalized by canceling the number of Oahe shares held by Emmick that is proportional to the overvaluation. *Frame v. Mahoney*, 21 Ariz. 282, 187 P. 584 (1920); *Koppitz-Melchers, Inc. v. Koppitz*, 315 Mich. 582, 24 N.W.2d 220 (1946); *Topanga Corporation v. Gentile*, 249 Cal.App.2d 681, 58 Cal.Rptr. 713 (1967). We note that this Court has upheld the cancellation of stock under circumstances where original issue stock was transferred for the worthless stock of another corporation or for services to be performed in the future. *Thompson v. Commonwealth Finance Corporation*, supra; *Walton v. Standard Drilling Co.*, 43 S.D. 576, 181 N.W. 96 (1921); and *Anderson v. Scandia Mining Syndicate*, 26 S.D. 558 128 N.W. 1016 (1910).

In *Thompson*, supra, the Court held that where a corporation issued stock to its directors for services to be performed in the future, the stock was void under our state constitution even though it had been transferred to an assignee of a director. See also *Frame v. Mahoney*, supra; *Koppitz-Melchers, Inc. v. Koppitz*, supra; *Topanga Corporation v. Gentile*, supra.

In *Axford v. Western Syndicate Inv. Co.*, 141 Minn. 412, 170 N.W. 587 (1919), which involved a South Dakota corporation and the application of South Dakota law, including article XVII, § 8 of the South Dakota Constitution, the Minnesota Supreme Court held that the trial court was justified in canceling shares of corporate stock that had been issued to defendant in exchange for the worthless stock of another corporation. The court rejected defendant's argument that because all the directors and stockholders had participated in the transaction, the stock issuance could not later be questioned, stating that the corporate entries fell "far short of being sufficient proof to establish [that] for which they purport to stand." 170 N.W. at 590.

The $19.00 per share valuation had no basis in fact and was meaningless except as an internal stock option price for sale to CM shareholders. Accordingly, we hold that the trial court erred in concluding that the value set by Emmick on the CM stock in the Emmick/Oahe transaction of $19.00 per share did not constitute fraud, deceit or misrepresentation.

## II

### Use of Cannon Loan Proceeds

Emmick used the $150,000 note proceeds to make a down payment on the 2,366 shares he bought from Danbury, to pay off a $50,000 corporate debt at the First Na-

---

4. Article XVII, § 8 of the South Dakota Constitution states:

   No corporation shall issue stocks or bonds except for money, labor done, or money or property actually received; and all fictitious increase of stock or indebtedness shall be void. The stock and indebtedness of corporations shall not be increased except in pursuance of general law, nor without the consent of the persons holding the larger amount in value of the stock first obtained, at a meeting to be held after sixty days notice given in pursuance of law.

tional Bank in Pierre, to pay $5,000 to one Marlyn Graham for his 100 shares in Oahe, to pay off a $15,000 loan used by Emmick to purchase another shareholder's shares in Oahe, and to pay Emmick's son $10,000 of a $25,000 finder's fee for the Cannon real estate transaction.

The trial court found that the $150,000 loan proceeds were used by Emmick to pay corporate debts and to acquire the stock of all the other Oahe shareholders except Golden. The trial court also found, however, that the $150,000 loan was a personal loan and not a use of corporate funds. Based on this latter finding, the trial court gave Emmick the option of retaining those shares so purchased in his name and owing the corporation $132,675 for those shares, or considering them corporate shares and allowing them to be canceled.

The $150,000 appears to have been given in part payment for the land to be transferred from Oahe to Cannon and was later deducted from the total purchase price of the Oahe-Cannon land sale. The balance due Danbury for his stock, $132,675.00, was also, by the terms of the escrow agreement between Oahe and Cannon, to be paid from money paid by Cannon. We consider the $150,000 paid by Cannon and later deducted from the total purchase price to be corporate money belonging to Oahe. (Emmick himself stated that he felt the $150,000 was Oahe's money.) The shares purchased with the $150,000 Cannon proceeds are more akin to treasury stock, even though Oahe may not have been in the position at that time to acquire treasury stock, and must therefore be canceled for purposes of the corporate dissolution.[5]

We have considered the remaining issues raised by Golden and find them to be without merit.

The judgment is reversed, and the case is remanded to the circuit court with directions to redetermine the fair market value of the CM stock exchanged by Emmick for Oahe stock, to order the cancellation of the 2,366 shares of stock purportedly acquired by Emmick with the proceeds of the $150,000 loan from Cannon, and to redetermine the pro rata shares of the total dissolution proceeds to which Golden and Emmick are respectively entitled following the adjustments in Emmick's stock holdings.[6]

All the Justices concur.

---

5. A corporation may purchase its own shares, but generally only with funds from "unreserved and unrestricted earned surplus available therefor." SDCL 47–3–43. The record indicates that Emmick used corporate funds to buy the 2,366 Oahe shares in question at a time when Oahe possessed neither earned surplus nor capital surplus. See SDCL 47–3–43. When redeemable shares are purchased by the corporation, the purchase shall effect a cancellation of such shares. SDCL 47–3–50. The statement of cancellation required was, of course, not filed here; nonetheless, we consider the 2,366 shares purchased by Emmick to be canceled, under either the theory that they were purchased (properly or improperly) by the corporation, or on the theory that Emmick—buying them for himself but with money clearly belonging to Oahe—has no right to the shares.

6. Three figures emerge from the record as being the total assets of Oahe available for distribution:
   1. The receiver's report, stating: "The amount of $581,585.72 was the amount of net assets available to distribute to stockholders of record as of March 15, 197[1], final date of tax liquidation."
   2. The trial court's finding number 55, which states: "total asset value of Oahe at present is $710,896.21 as determined by the final accounting."
   3. The total of Golden's and Emmick's interests, as computed by the trial court in finding number 55 and conclusion number 25: $46,281.41 and $647,073.03, for a total of $693,354.44.
   We leave to the trial court the determination of total corporate assets available for distribution.