Warren GOLDEN, Plaintiff
and Appellant,

v.

OAHE ENTERPRISES, INC., a South Dakota Corporation, Donald D. Emmick, individually and as a Director and the President of Oahe Enterprises, Inc., and Robert Emmick, individually and as a Director and Secretary of Oahe Enterprises, Inc., Defendants and Appellees.

No. 13412.

Supreme Court of South Dakota.

Argued Oct. 20, 1981.

Decided May 19, 1982.

Rehearing Denied June 21, 1982.

Ronald G. Schmidt of Schmidt, Schroyer, Colwill & Zinter, P. C., Pierre, for plaintiff and appellant.

Glen H. Johnson of Banks & Johnson, Rapid City, for defendants and appellees.

FOSHEIM, Justice.

This dispute has been before this court on four previous appeals,[1] to which we refer for a further statement of facts. In our 1976 decision, having found that Warren Golden (Golden) had been denied his shareholder rights, we ordered that Oahe Enterprises, Inc. (Oahe) be dissolved, that an accounting be made of its assets, and that Golden receive his pro rata share of Oahe's assets on dissolution. We remanded for trial on the merits the issues of wrongful appropriation of corporate assets by Donald and Robert Emmick and the issue of fraud and attendant damages.

In the 1980 case we held that Donald Emmick's (Emmick) valuation of the CM stock at $19 (an internal stock option price set by the CM Board of Directors) was fraudulent and that he was liable to Oahe for the difference between the actual market value of the CM stock at the time of transfer (1966) and his valuation of the stock at $19. We also concluded the trial court incorrectly found that the $150,000 transferred from Charles Cannon (Cannon) to Emmick was a personal loan; we held that this money was part payment for property Oahe sold Cannon. This court then remanded, ordering, among other things, a redetermination of the fair market value of the CM stock and a redetermination of each party's pro rata share of the proceeds from the dissolution of Oahe. Golden appeals from the judgment entered by the trial court following the 1980 remand. We affirm in part, reverse in part and remand.

The first issue is the market value determination of the CM stock Emmick exchanged in 1966 for Oahe stock. On remand the trial court adopted the Receiver's valuation of $13.34 for the market value of the CM stock. Appellant urges this court to reject such valuation and to value the stock at $0.34 per share. The finding of the trial court on the fair market value of the stock is presumed correct and it will not be set aside, although the evidence is conflicting, unless it is clearly erroneous. The question on appeal is not whether this court would make the same finding, but whether there is sufficient evidence to support the trial court's finding. *In Re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970); SDCL 15-6-52(a). We believe there is sufficient evidence in the record to support the trial court's finding on valuation and therefore refuse to set it aside as clearly erroneous.

Golden next complains that the trial court improperly granted Emmick certain

1. *Golden v. Oahe Enterprises, Inc.*, 295 N.W.2d 160 (S.D.1980); *Golden v. Oahe Enterprises, Inc.*, 90 S.D. 263, 240 N.W.2d 102 (1976); *Oahe Enterprises, Inc. v. Golden*, 88 S.D. 296, 218 N.W.2d 485 (1974).

personal credits against the amount due from him on the final accounting. These credits relate to Emmick's use of the $150,000 he received from Cannon in part payment for land sold by Oahe to Cannon. We discussed the disposition of this $150,000 in our 1980 decision. Prior to that decision, the trial court had characterized the $150,000 as a personal loan from Cannon to Emmick. Our 1980 decision said that that characterization was incorrect. We held it was not a personal loan from Cannon to Emmick but was corporate money as it was "given in part payment for the land to be transferred from Oahe to Cannon and was later deducted from the total purchase price of the Oahe-Cannon land sale." 295 N.W.2d at 166.

■ On this appeal, Golden asserts that the trial court improperly directed the Receiver to allow Emmick a $50,000 credit on the amount of money due from him on the accounting. This $50,000 is the same $50,000 which we stated in our 1980 decision came from Cannon's initial $150,000 payment and which Emmick used to pay off a corporate debt due the First National Bank in Pierre. *Id.* at 165–66. The trial court should not have granted Emmick a $50,000 credit as he did not use personal funds to satisfy the note.

■ Golden next asserts that the trial court improperly allowed Emmick a personal credit of $36,866 on the amount due from him on the accounting. This figure is also tied up with the Cannon purchase and is discussed in our 1980 decision. From the $150,000 initial Cannon payment Emmick paid $54,191 on the purchase of the Danbury stock. The total purchase price of the Danbury stock was $186,866.00. In our 1980 decision we stated that "[t]he balance due Danbury for his stock, $132,675.00 was also, by the terms of the escrow agreement between Oahe and Cannon, to be paid from money paid by Cannon." *Id.* at 166. Nevertheless, on remand the trial court allowed Emmick a $36,866 credit on the theory that the Danbury stock cost $186,866, $150,000 coming from the initial Cannon payment and the balance, $36,866, from

Emmick's own pocket. The trial court reasoned that Emmick should therefore get credit for the personal funds he expended. That credit cannot stand, however, since we had previously determined that the balance due on the Danbury stock was paid totally with corporate funds.

■ Golden also complains that the trial court improperly allowed Emmick a credit of $15,000 on the amount due from him on the accounting. This credit involves a finder's fee of $25,000 paid to Emmick's son. In our 1980 decision we noted that $10,000 of the $25,000 finder's fee was paid from Cannon's initial $150,000 payment. *Id.* For the following reasons we believe the trial court erred in allowing the $15,000 credit. First we note that the trial court's Findings of Fact and Conclusions of Law of August 1978, which were incorporated into its Findings of Fact and Conclusions of Law of March 1981, stated that Emmick paid his son a $25,000 finder's fee in regard to the Cannon land sale, and that this fee was reasonable and therefore not due and owing to the corporation. The trial court treated this $25,000 as a reasonable corporate expense. Secondly, Emmick testified that the finder's fee was paid with corporate money.

Q: (Mr. Schmidt): And then you also mentioned in your Interrogatory that $25,000 of the Cannon proceeds went to pay off the broker on the sale of the land?

A: Yes. It was a finder's fee.

Q: Is that the licensed broker that made the sale?

A: No. We made the sale ourselves. I did. With my son.

Q: You didn't use McDaniels?

A: We didn't use McDaniels, no. His listing run out and we didn't use McDaniels, no.

Q: What do you mean, a finder's fee?

A: It was my son.

Q: Oh, you mean you paid the $25,000 of the Cannon proceeds to your son as a finder's fee?

A: Right. . . . And he is not a broker. He is not a real estate man. But I gave him $25,000 finder's fee. I think I gave him $10,000 one time and then on the proceeds of the Cannon payment I gave him, over another one or two years, another $15,000.

Q: Is this your son Bob?

A: Yes.

\* \* \* \* \* \*

Q: So actually, then, Bob's contract was before you bought out the other shareholders?

A: I would say yes. Or right in there about the same time, um-hum.

Q: And did they consent to a finder's fee of $25,000 to Bob?

A: No. That was never discussed to them to my knowledge. Maybe it was. I don't know. They knew that I had a buyer when I bought them out. I told them. I mean, I laid it right on the table, Ron, and told them exactly what Cannon's desires were. And it was a fair plan, you know. (Emmick Deposition, December 1976, pp. 65–66 and 70).

Thirdly, Emmick's counsel does not point us to any evidence, and we are unable to find any, to the effect that Emmick paid the finder's fee from personal funds. In fact the record is to the contrary. A finder's fee is a legitimate corporate expense, the trial court found it was reasonable in amount, and Emmick's own testimony is to the effect that he paid it with corporate funds. We therefore conclude that the trial court should not have allowed Emmick a credit for the finder's fee.

On remand the trial court held that the issue of damages due to Emmick's fraud was disposed of in this court's 1980 decision and therefore would not be considered. Golden assigns this as error. The trial court was correct. This court stated the measure of damages for Emmick's fraudulent conduct a number of times in the 1980 opinion. We found him "liable for what courts term secret profit"; that as a promoter he "may be required to account for such profit"; that he is "liable for the shortfall to the corporation"; and that the "difference can be equalized by canceling the number of Oahe shares held by Emmick that is proportional to the overvaluation." *Id.* at 164–65. We reiterate, the measure of damages is limited to the overvaluation of the shares. Such overvaluation is payable to the corporation, not Golden. The trial court recognized this and correctly refused to accept Golden's arguments.

Golden next argues that the trial court erred when it refused to grant him prejudgment interest on his distributive share of Oahe assets and other monies owing as a result of such accounting. In his Motion Concerning Issues on Remand, in his Proposed Findings of Fact and Conclusions of Law, and in his Proposed Supplemental Findings of Fact and Conclusions of Law, Golden argued that he was entitled to prejudgment interest pursuant to SDCL 21–1–11,[2] citing SDCL 54–3–5[3] for the correct rate of interest. On appeal Golden argues that the trial court's denial of prejudgment interest based on SDCL 21–1–11 was error because this statute "is simply not applicable to this case." Golden now urges that SDCL 54–3–5 entitles him to prejudgment interest. Since Golden did not claim entitlement under SDCL 54–3–5 before the trial court, we will not review the trial

**2.** SDCL 21–1–11 reads:

Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt.

**3.** At the time of remand, SDCL 54–3–5 read:

Unless, within the limitation of § 54–3–7, there is an express contract in writing fixing a different rate and in the case of a judgment, interest is payable on all moneys at the rate of twelve percent per annum or at the maximum rate allowed in § 54–3–7, after they become due on any instrument of writing, and on moneys lent, or due on any settlement of accounts, from the day on which the balance is ascertained, and on moneys received to the use of another and detained from him.

court's ruling on appeal. *Northwestern Engineering Co. v. Thunderbolt Enterprises, Inc.*, 301 N.W.2d 421 (S.D.1981).

Golden's final contention is that the trial court should have granted him his statutory costs in the original action. This court found that a similar cost issue was without merit in our 1980 decision. Additionally, the record reveals that, on remand from our 1980 decision, Golden submitted a Proposed Judgment and an Amended Proposed Judgment. Both provided that the respective parties pay their own costs. We accordingly affirm the trial court on this issue.

We remand with directions to cancel the credits of $50,000, $36,866 and $15,000 granted Emmick on the final accounting, and to redetermine Golden's and Emmick's pro rata share of the proceeds from Oahe's dissolution.

The case is remanded as affirmed in part and reversed in part.

WOLLMAN, C. J., and DUNN and MORGAN, JJ., concur.

HENDERSON, J., concurs specially.

HENDERSON, Justice (specially concurring).

I join in the majority opinion which denies a credit to Emmick of $50,000.00, $36,-866.00, and $15,000.00; and I further join the majority's denial of Golden's claims for damages based upon fraud, prejudgment interest and statutory costs. I feel obligated to the litigants, however, to comment upon the trial court's valuation of the CM stock and to also cite reasoned authority on this issue.

From reviewing the record herein, I am convinced that the trial court thoughtfully and correctly followed the admonition of this Court in its decision in *Golden v. Oahe*, 295 N.W.2d 160, 166 (S.D.1980) "to redetermine the fair market value of the CM stock exchanged by Emmick for Oahe stock[.]"

The findings of the trial court on the fair market value of the stock in question, although there be conflicting evidence thereon, are presumed to be correct and such findings will not be set aside unless they are clearly erroneous. SDCL 15–6–52(a); *Drake v. Sample*, 279 N.W.2d 685 (S.D. 1979).

The function of this Court on appeal is not to determine the weight or credibility of the testimony nor whether it would have made the same or a similar fact determination; rather, our function is to determine whether or not there is evidence from which the trial court could properly draw its conclusion. *See First Northwestern Trust Co. of South Dakota v. Family Homes, Inc.*, 303 N.W.2d 352 (S.D.1981); *Estate of Podgursky*, 271 N.W.2d 52 (S.D. 1978); *Larson v. Syverson*, 84 S.D. 31, 166 N.W.2d 424 (1969). Here, the trial court was faced with conflicting evidence. Of necessity, it had to sort out this evidence. This Court, in its remand, gave the trial court a job to do. I maintain that the trial court did a good job.

We have before us the issue of a redetermination of the market value of closely held stock. It is, simply, a question of fact. No universally applicable formula has been devised. The courts are in general agreement that actual transactions are the best indicators. *See Rubber Research, Inc. v. Commissioners of Internal Revenue*, 422 F.2d 1402 (8th Cir. 1970); *Worthen v. United States*, 192 F.Supp. 727 (D.C.Mass.1961); *Fitts' Estate v. Commissioner of Internal Revenue*, 237 F.2d 729 (8th Cir. 1956).

Let us examine the evidence which the trial court considered as it coped with "market value."

1. Jerry Fischer, the receiver's C.P.A., was a witness called by appellant, not by appellee. One would ordinarily believe that you are bound by your own testimony. Fischer testified that the average selling price of the CM stock in 1966 was $13.34 per share. Appellant now urges this Court to disregard the testimony of his own witness. As an expert, Fischer further testified that the receiver's method of computing fair market value was "the fairest method of determining fair market value." The receiver's method of computing the fair market value was based upon the average sell-

ing price for newly issued stock in 1966. Moreover, Fischer testified that the new stock issue, sold by the corporation, represented a good example of the market situation where willing buyers were buying stock from a willing seller, namely the corporation.

2. The trial transcript supports that Jerry Jackson testified to actual sales of $25.00 per share; $20.00 per share; $15.00 per share; $9.00 per share; and $6.00 per share.

3. The receiver found "fair market value" based upon the corporation's sale of stock. This value was representative of sales between individuals, during the same time as the corporate sales: (a) highest sales between individuals being at $25.00 per share; (b) a sale of 1,000 shares to John Dorfler of Ricketts, Iowa, at $25.00 and another sale to the same individual at $20.00; (c) in 1966, "possibly fifty transactions in the $12.00–$15.00 range" per testimony in the transcript.

4. Donald Emmick testified that he paid one George Qualley $19.00 per share for each share of CM stock that he had initially borrowed from Qualley when the Oahe corporation was formed. Emmick's testimony was by deposition and this sale was corroborated and confirmed by the deposition testimony of Qualley.

5. The trial court considered the testimony of Dave Timpe, C.P.A. After numerous objections by appellee's counsel, the trial court received Timpe's opinion of fair market value into evidence as being $0.34 per share. Guardedly, the trial court remarked that his opinion would be treated as a matter of "weight." A fair inference to be drawn is that the trial court did not want to be bound by this testimony. The cross-examination of Timpe impeached his conclusion. Indeed, it was so damaging that the trial court refused to give any weight to the $0.34 per share valuation. This, of course, was the trial court's prerogative in a bench trial. The trial court's rejection of $0.34 per share was based on several factors. These include (a) Timpe's restrictive use of criteria such as dividend potential, past earnings, book value per

share, and outlook for general trend of the particular corporation and the industry as a whole; (b) Timpe's failure to follow his own definitions of valuation and fair market value; (c) his failure to compare sales of stock in other nursing home corporations; (d) his limited knowledge of CM's affiliates; (e) his limited examination of but four of seventeen affiliates' statements; (f) his narrow approach that CM's principal assets were accounts receivable, thereby failing to consider large capital outlays and time necessary to trigger a profitable operation; (g) his lack of knowledge of the valuation of the physical assets, including land, of CM. These are but a few examples and do not reflect the entire weaknesses of Timpe's $0.34 per share valuation of the CM stock.

There can be no doubt that there were actual transactions on CM stock during 1966. Other courts have reasoned that actual transactions are considered the best determination of fair market value where stock changes hands between a willing buyer and seller, neither being under any obligation or compulsion to buy or sell, and both parties having adequate knowledge of all the material facts and circumstances affecting the value. *See Worthen v. United States,* supra; *Stephenson v. United States,* 238 F.Supp. 660 (W.D.C.Va.1965); *Huntington Nat. Bank Company v. United States,* 62–2 U.S.T.C. § 12088 (D.C.Ohio 1962).

Where, as here, a closely held corporation is involved, the parties deemed it necessary to resort to the opinions of experts to establish the fair market value of the stock involved. Authority permits this. *Bader v. United States,* 172 F.Supp. 833 (S.D.C.Ill. 1959). C.P.A. Fischer testified that the *book value* of the stock is not all inclusive of what the stock ought to sell for. A trial court has the right to consider all, part of, or none of an expert's testimony. Furthermore, it can accept the testimony of one expert and attach another expert's testimony thereon if it is credible. Inherently, any trial judge has a most difficult legal problem to contend with when he must ascertain the fair market value of infrequently sold, closely held unlisted stock. *See Central Trust Company v. United States,* 305 F.2d

393 (Ct.Cl.1962). In light of the substantial evidence supportive of the trial court's finding and all of the above-cited authorities, it appears that the isolated testimony and strictured approach of Timpe smacks of unreasonable disparity.

Under the previous decisions pertaining to this entire litigation, the trial court had the power to establish the value of the stock at *any* figure provided that valuation was (1) supported by credible evidence in the record; (2) indicative of the true value at the time of transfer, all factors considered; and (3) not based upon the stock's future, potential or speculative value. The trial court's decision on the fair market value of $13.34 per share for exchange purposes is supported by substantial, credible evidence and is not clearly erroneous.