**Merlyn LITTAU, Plaintiff and Appellee,**

v.

**MIDWEST COMMODITIES, INC., Harlan Pease, Telford Tofflemire, Defendants and Appellants.**

**Charles Lefforge, d/b/a Chuck's Aerial Sprayers, Defendant.**

**No. 13284.**

Supreme Court of South Dakota.

Considered on Briefs Oct. 21, 1981.

Decided March 3, 1982.

Dale Benson, Willoughby & Benson, Burke, for plaintiff and appellee.

Thomas M. Tobin of Maynes, Tonner, Maynes & Tobin, Aberdeen, for defendants and appellants.

FOSHEIM, Justice.

Harlan Pease, Telford Tofflemire and Midwest Commodities, Inc. (Midwest) appeal from a Judgment entered in favor of Merlyn Littau. We reverse in part, affirm in part and remand.

Midwest held a meeting at Winner, South Dakota on November 9, 1978 to promote Sunoil 1000 hybrid sunflower seed. At this meeting Appellee discussed becoming a dealer of this seed with Appellant Tofflemire, Chuck Lefforge (a defendant below) and Roy Leicht (apparently an agent of Midwest, but not a defendant). The following day, Appellee met again with these people and agreed to sell Sunoil 1000 seed. Appellee then paid for, and took delivery of, 55 bags of seed with assurance from Midwest that any unsold seed could be returned. He placed an order for 90 additional bags of seed in April of 1979. When the 1979 sunflower planting season ended, Appellee had sold or planted 31 bags of the seed. On June 29, 1979, a stop sale order was imposed on the remaining 114 bags of seed by the South Dakota Department of Agriculture because the variety name of the seed was misrepresented on the labels attached to each seed bag. The name incorrectly read "Sunoil 1000 Hybrid Sunflow-ers"; it should have read "894 Hybrid Sun-flowers." Appellee applied for and was granted a release from the stop sale order so that the seed could be returned to Mid-west for proper labelling, he then requested from Midwest permission to return the 114 bags of unsold seed and refund of his pur-chase price. Midwest refused.

The main issues are whether the evidence supports the trial court's findings and whether such findings support the conclu-sions of law.

On the issue of the sufficiency of the evidence to support the trial court's find-ings, we are mindful that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." SDCL 15–6–52(a). Thus we cannot disturb the trial court's findings unless, after reviewing the evidence, we are "left with a definite and firm conviction that a mistake" was made by the trial court. *In Re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455, 459 (1970). In this case the Defendants rested absent any proffered testimony.

The record leads us to conclude the trial court clearly erred in finding that Appellants represented to Appellee that the seed was certified. The following excerpt is representative of Appellee's testimony concerning the November 9th and 10th con-versations with Appellant Tofflemire, Mr. Lefforge and Mr. Leicht.

Q. (by Mr. Benson) At this meeting, these three gentlemen, who you've previously indicated, Roy, Chuck and Tel were present, you and your wife, and you had some discussion with these gentlemen as to becoming a seed dealer, is that right?

A. Seed dealer, right, yeah.

Q. Do you remember any particular con-versation from any of those particu-lar people?

A. Well, we just kind of talked together over a cup of coffee there about sell-ing seed.

Q. You were all at this table when this discussion took place?

A. Yeah.

Q. What transpired as far as the discussion at that time?

A. Well, he just asked me if I was interested, and I said, "Yeah, I'd talk about it." So the—I said, "Give me some booklets about it." And he kind of talked to me, and my wife talked it over, and I said I'd probably take it. So we took it.

. . . .

Q. Well, what did he [Tofflemire] specifically state, in a more specific terms, as to the seed itself?

A. Well, this—it was a—I was just the only dealer out there to sell pretty good out there, and—

Q. —You'd have a large territory, then?

A. Yeah, a large territory out there.

Appellee's testimony indicates no oral representations about certification. It appears, however, from Appellee's testimony that he got the impression the seed was certified when he received a letter from Mr. Tofflemire directing him to procure the 1978 South Dakota Certified Seed Directory,[1] which included the name of Mr. Lefforge. The belief that this meant the seed was certified is negated by the fact that on the inside cover of the seed directory, under the clearly printed words "PLEASE NOTE," it is explained that the inclusion of a grower's name in the directory does not necessarily mean the grower's seed is certified, but rather means that application for certification has been made and that the seed has passed all inspections to date.[2] The finding that Appellants misrepresented the seed as certified is also refuted by the fact that none of the seed bags Appellee picked up on November 10th were tagged with a blue tag, indicating that the bag contained certified seed. Appellee testified

that he is an experienced farmer and also a Northrup King seed dealer. According to the testimony of Mr. Glen Koskinen, a seed marketing specialist for the United States Department of Agriculture, if a seed dealer takes delivery of bags of seed which are not affixed with blue tags, he knows immediately that the seed is not certified. Mr. Koskinen also testified that a seed dealer with certified seed for sale would normally want to advertise that fact. Appellee, however, made no mention in his advertisements that the seed he offered for sale was certified. This is consistent with Appellant Tofflemire's instruction to Appellee in the November 24, 1978 letter: "You should run a classified add [sic] in your paper also. Just say to the effect that you are the local dealer and are now taking orders for sunoil 1000 sunflower seed, and give your phone # ." Likewise, the promotional information appellee was given at the November 9th meeting (a brochure advertising Sunoil 1000 and a general fact sheet on sunflower production) did not advertise the seed as certified.

∎ The trial court also found "[t]hat the seed sold to the Plaintiff was represented to be a clean, quality seed of uniform size. That state and federal tests of this lot number or commercial unit and Plaintiff's Exhibits # 20–24 established that the seed was not of the quality represented and that a high percentage of the seed was worm-eaten, that it contained large pieces of inert matter or trash which would not normally pass through a farmer's planter, that the seed was not graded as to size and is practically worthless." That finding is clearly erroneous. It appears the trial court made this finding based on the results of federal and state tests done on Sunoil 1000 seed other than that sold to the Appellee. The best evidence whether the seed purchased

---

1. The letter from Mr. Tofflemire to Appellee advised him to get a copy of the 1978 South Dakota Certified Seed Directory from his county agent and to "see pages 3 and 4, our sunflowers are the only ones listed."

2. This is verified by Mr. Bachman, Director of the Fertilizer & Seed Program, Division of Regulatory Services, South Dakota Department of

Agriculture. He testified that a listing in the seed directory meant only that Mr. Lefforge applied to have his field inspected, as the first stage in the certification process, but that certification is not completed until the seed is properly tagged with certification tags at the time of sale.

was as represented comes from appellee's testimony. He answered "yes" to a direct question whether the seed was as represent- ed except for the brand name. Appellee also testified that the seed he bought was the same size as the seed he was shown at the November 10, 1978 meeting, and that he planted, harvested and sold a crop of Sunoil 1000 from the seeds purchased from Appellants. Appellee said he noticed some dirt in the seed planted but "didn't pay that much attention to it."

Equally revealing on the question of the cleanliness, quality and worth of the seed is the testimony of the State Department of Agriculture employees that the seed in question passed state tolerance tests comparing the seed in the bag with the specifications stated on the label attached to the bag. These specifications listed the percentage of pure seed, inert matter, crop seed, weed seed and the germination percentage of the seed. Appellee acknowledged that the seed passed these tests.

We next turn to whether the conclusions of law that the Appellants are liable to Appellee for intentionally and negligently misrepresenting the seed to be of the Sunoil 1000 variety, bred by Mr. Lefforge, are adequately supported by the findings.

Findings # 4 and # 5 state in part that the Appellants knowingly misrepresented[3] to the Appellee that the seed was a new variety called Sunoil 1000, developed by Mr. Lefforge, when in fact he was sold 894 Hybrid sunflower seed which was developed and released to the public by the United States Department of Agriculture. It is clear from the testimony of the State and Federal agriculture experts that Mr. Lefforge was not the breeder of the seed.

These experts also established that use of the name Sunoil 1000 for the variety name was a misrepresentation and that was why the stop sale order was imposed.

■■ More than a finding of knowledge of falsity is required to warrant a conclusion of liability based on intentional misrepresentation. Intentional misrepresentation is defined by SDCL 20–10–1 as a wilful deception[4] made with the intention of inducing a person "to alter his position to his injury or risk." We have held that an action for deceit requires proof that the misrepresentations were material to the formation of the contract and that the plaintiff relied on the misrepresentations to his detriment. *Aschoff v. Mobil Oil Corp.*, 261 N.W.2d 120 (S.D.1977); *Schmidt v. Wildcat Cave, Inc.*, 261 N.W.2d 114 (S.D. 1977); *Viajes Iberia, S. A. v. Dougherty*, 87 S.D. 591, 212 N.W.2d 656 (S.D.1973).

■ The trial court's conclusion of intentional misrepresentation is inadequately supported because there are no findings that the name of the variety or of the breeder were material to the transaction or that the Appellee relied to his detriment on the misrepresentation of variety or breeder. Our review of the trial transcript indicates that the court did not make such findings because there was no evidence to support them. Actually, the evidence presented suggests that the misrepresentations were not material or relied upon. Mr. Umiker, an inspector for the South Dakota Department of Agriculture, testified that the misrepresentation of the variety name was nothing more than a technicality, but nevertheless a violation of state law which necessitated the stop sale order. The ad-

---

**3.** It is not necessary to determine whether the findings of a knowing misrepresentation of variety name and breeder is supported by sufficient evidence, in light of our conclusion that the trial court's findings do not adequately support its conclusion of intentional misrepresentation on these points.

**4.** SDCL 20–10–2 states:

A deceit within the meaning of § 20–10–1 is either:

(1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
(2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;
(3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or
(4) A promise made without any intention of performing.

vertising brochure for Sunoil 1000, which Appellee was given at the November 9th meeting, the Certified Seed Directory, and the advertisement Appellee placed in area newspapers all state that the sunflower seed in question is a USDA hybrid. The Certified Seed Directory specifically states, over the name and address of Mr. Lefforge, that the seed is "HYBRID 894—Hybrid 894 is produced using USDA inbred lines." Appellee testified that he picked up the Certified Seed Directory at Appellant Tofflemire's suggestion. In the face of that record it is inconceivable that Appellee did not know the seed he bought was a USDA hybrid. Apparently, the trial court was similarly impressed. In referring to the advertising brochure for Sunoil 1000, the judge stated: "Exhibit 6 indicates Mr. Lefforge is the breeder. Anybody with any general knowledge knows he's not the breeder of this variety. It's a variety produced by the government."

■■ We next address the issue of negligent misrepresentation. This court has stated that the party seeking relief under this theory must prove:

> "[K]nowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will because of it be injured in person or property. Finally, the relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care."

*Boss v. Claude*, 69 S.D. 254, 9 N.W.2d 262, 264 (1943) (citations omitted). Our later cases have held that the relationship of the parties determines when such a duty arises. No duty will be found unless a complex transaction is involved requiring one of the parties to rely on the superior knowledge of the other. *Fleming v. Torrey*, 273 N.W.2d 169 (S.D.1978); *Moore v. Kluthe & Lane*

*Ins. Agency, Inc.*, 89 S.D. 419, 234 N.W.2d 260 (1975). In addition to the absence of findings on materiality, reliance and detriment, the trial court made no findings as to complexity or that the Appellants possessed superior knowledge giving rise to a duty. Our review of the record reveals no basis for such findings.

We are left then with evidence to support findings that Appellant Midwest promised to accept return of Appellee's unsold seed and the trial court's conclusion that Midwest breached the contract when it refused to accept return. The measure of damages for breach of contract in this case is the amount of money Appellee paid Appellant Midwest for the seed remaining. SDCL 57A-2-711. The evidence does not support an award of incidental or consequential damages.

We therefore remand with instructions for the trial court to absolve Appellants Tofflemire and Pease of personal liability under the contract between Appellee and Appellant Midwest. The trial court is also instructed to allow Appellee a refund for any remaining seed.[5]

Other issues raised are either without merit or unnecessary to decide in view of our decision.

DUNN, Justice, and MORGAN, JJ., concur.

HENDERSON, J., concurs specially.

WOLLMAN, C. J., concurs in part and dissents in part.

HENDERSON, Justice (concurring specially).

I agree that Midwest Commodities, Inc., breached its contract (Conclusion of Law # 1) when it refused to accept the return of the seed and to reimburse appellee for the unsold seed. Midwest Commodities, Inc., through its agents and employees, represented to appellee that any unsold seed could be returned to it and this promise was

---

5. The record indicates that Appellee returned the remaining seed to Appellant Midwest on the day of trial.

part of the contract entered into on November 10, 1978, when appellee purchased his first 55 bags of seed. Finding of Fact # 10 pertains to this promise, and was supported by the evidence and not clearly erroneous.

To establish a breach of warranty or intentional or negligent misrepresentation, the evidence must show that the seed was represented as being certified *or* that it was defective in quality.

There was no "scam," fraud, cheat, deceit, false misrepresentation (intentional or negligent), or breach of warranty (express or implied) with regard to the seed in question as:

(1) South Dakota State University, Brookings, South Dakota, tested the seed on August 20, 1979, and submitted a report (exhibit 22) indicating 99.79% pure seed; 0.21% inert matter; 0.00% weed seed; and 92% germination. These figures were within established quality levels recognized in the seed business. Hence, the trial court's Finding of Fact # 8 stating that "for all practical matters, [the seed] was worthless" is clearly erroneous.

(2) A representative of the South Dakota Department of Agriculture took seed samples at appellee's farm on June 29, 1979. The State Department of Agriculture indicated through exhibit 22 that, according to the information on the seed label, the seed was 99.96% pure seed; 0.04% inert matter; 0.00% weed seed; and 94% germination. Again, these figures were within established quality levels. Finding of Fact # 7 by the trial court, stating that the seed "is practically worthless," is contrary to the results of this test and is also clearly erroneous.

(3) Appellee himself satisfactorily planted and harvested a crop from the seed in question. There is no evidence that the allegedly worthless seed contributed to or caused any damage to appellee. It is to be noted that appellee had participated in both farming and the commercial seed business since he was a boy. This is not a case where the city slicker took advantage of an innocent farmer.

(4) The alleged certification of the seed is not begot by the facts:

(a) Appellee did not advertise that he had certified seed for sale;

(b) Midwest Commodities did not furnish seed sacks with attached blue tags, which denote certified seed;

(c) There is no testimony by appellee or anyone else that the seed was orally represented as being certified; and

(d) There was no written document (to include the Directory in evidence) reflecting that the seed sold was certified.

Thus, the cause of actions sounding in false misrepresentations and breach of warranty fall since the trial court's findings of fact and conclusions of law are clearly erroneous under the state of the record herein.

WOLLMAN, Chief Justice (concurring in part, dissenting in part).

Although I join in that portion of the opinion which affirms the judgment against Midwest Commodities, Inc., under the breach of contract theory, I would also affirm the judgment against Midwest Commodities, Inc., and Tofflemire on the theories of intentional and negligent misrepresentation and breach of warranty. Without belaboring the evidence, I conclude that it supports the trial court's findings on these theories. I find the following comments made by the trial court at the conclusion of the trial to be revealing:

But one thing that has been proven is that he's [Littau] paid out $9,450 for just about worthless seed.... The individuals involved have pulled a scam here. You can tell it by the different representations they made that were not true.

. . . .

These are intelligent individuals; they knew it was not their own variety; they knew that they were misrepresenting the seed.

In making these comments the trial court referred to Tofflemire's letter directing Littau to procure a copy of the 1978 South Dakota Preliminary Certified Seed Directory. Although it is true, as pointed out in

the majority opinion, that the directory indicates that the inclusion of a grower's name therein does not necessarily mean the grower's seed is certified, it also states that: "The growers listed will, therefore, only accept tentative orders that will be filled if seed is finally certified, which fact will be designated by the certificate." In the light of the totality of the circumstances surrounding the transaction, I believe that it was eminently reasonable for the trial court to draw the inference that Littau was led to believe that the sunflower seed was in fact certified. Appellants Midwest and Tofflemire should not now be heard to say that Littau should not have relied upon these representations.

I agree with the majority opinion that there is not sufficient evidence in the record to impose personal liability against appellant Pease. I would therefore affirm the judgment against Midwest and Tofflemire (the judgment standing unappealed as to defendant Lefforge).