TRI–STATE REFINING AND INVEST-
MENT COMPANY, INC., Plaintiff
and Appellee,

v.

APALOOSA COMPANY, Sioux Enter-
prises—Lorentz Opdahl, and Lorentz
Opdahl, an Individual Person, Defend-
ants and Appellants.

No. 15953.

Supreme Court of South Dakota.

Argued Aug. 30, 1988.

Decided Nov. 9, 1988.

Thomas K. Wilka of Hagen & Wilka, P.C., Sioux Falls, for defendants and appellants; Rick Johnson of Johnson, Eklund & Davis, Gregory, on brief.

Richard J. Helsper of Erickson & Helsper, P.C., Brookings, and Stephen M. Palmer, Sioux Falls, for plaintiff and appellee.

SABERS, Justice.

Lorentz Opdahl (Opdahl) appeals a damage award for fraud and breach of a lease contract, and sanctions imposed upon him pursuant to SDCL 15–6–11.

### Facts

In 1973, Robert Hoff (Hoff) married Linda Opdahl (Linda) and began working with Linda's father, Opdahl, at Sioux Fertilizer Company in Hawarden, Iowa. That same year Opdahl started a small business extracting silver from X-ray and other film products (Tri–State). The business prospered. In 1976, Opdahl purchased a gas-fired smelting unit and moved it to his farm near Hudson, South Dakota. Hoff managed Tri–State throughout this time.

In 1978, at the urging of several associates,[1] Opdahl placed his property into three trusts, with Opdahl named as trustee on each. The first trust, Sioux Enterprises (Sioux), consisted of the fertilizer business in Hawarden. Opdahl placed the refining business into a second trust known as Tri–State Refining Company. Finally, Opdahl placed the Hudson farm into a third trust, the Apaloosa Company (Apaloosa).

In November of 1979, Tri–State leased the Hudson farm from Apaloosa. The lease provided for a rental term of one year at $200 per month. Tri–State purchased equipment to mint the refined silver into bars at this farm.

Opdahl approached Hoff in 1980 concerning the purchase of Tri–State. In April of 1980, Opdahl and Hoff agreed upon a proposal, drawn up by Opdahl, for the sale of Tri–State. Opdahl was to receive 13,750 ounces of silver, valued at $275,000. In addition, Hoff agreed to pay a bank note owed by Tri–State before May 1, 1980. Finally, the proposal provided that Hoff was to make monthly payments over a period of ten years, beginning September 1, 1980. The proposal indicated that these payments would cover one-half the equity of Tri–State, plus certain other equipment.

A purchase and sale agreement, modeled after the proposal, was signed by Opdahl and Hoff on August 28, 1980. The sales agreement additionally provided that Hoff would continue to pay $200 per month rent for the lease of Apaloosa and that this rent was to be included in each monthly payment over ten years.

In December 1980, Hoff moved much of the Tri–State business to Sioux Falls. In February 1981, Hoff incorporated the Tri–State business. Tri–State continued to make monthly rental payments as some of the business remained on the leased property. Shortly thereafter, Opdahl made several attempts to evict Tri–State from the Apaloosa property. Opdahl sent a notice purporting to terminate the lease agreement and engaged in numerous physical interferences with Tri–State's use of the property. When Opdahl took possession of 75% of the property in October 1981, Tri–State reduced its monthly rental payments by $100. Eventually, Tri–State abandoned the remaining equipment on the property in 1983.

Tri–State experienced financial difficulties in 1981. Hoff suspected these difficulties stemmed from internal problems and hired a private investigator. This investigation led to a 1982 confession by an em-

---

1. These associates were John Haller, Raymond Ehrman, Leroy Sveeggen, Harry Gregerson, Lowell Anderson, and Arthur Tranakos. With their assistance, Opdahl created several trusts for tax avoidance purposes. Opdahl and his associates transferred large amounts of money to the Cayman Islands in furtherance of these tax avoidance schemes. They also filed their own judgments, orders, and notices throughout these proceedings. Opdahl would have this court believe that he was innocently taken in by these individuals. However, the record reflects that Opdahl understood, approved, encouraged, and participated in these schemes. *See* discussion concerning sanctions, *infra* at part 4.

ployee, Nathan Clary (Clary), that he had stolen silver from Tri–State. Clary also admitted that he assisted Opdahl in removing excessive silver during 1980. It was undisputed that Opdahl received silver from Tri–State several times during the first six months of 1980. However, there was conflicting testimony concerning the amount of silver Opdahl received. Opdahl claimed that he did not even receive the amount he was entitled to under the sales agreement. In contrast, Tri–State, through its witnesses Clary and Paul East (East), a certified public accountant who reviewed Tri–State's financial records, claimed the amount received by Opdahl greatly exceeded what he was entitled to under the contract. This testimony indicated Opdahl received nearly $1,000,000 in silver.

Tri–State sued Apaloosa and Opdahl in 1984. The complaint alleged damages for breach of the lease contract and willful interference with Tri–State's use of the leased property. In 1986, Tri–State amended its complaint to include a claim for conversion of silver by Opdahl and his agents. After the close of the evidence at trial, the trial court permitted Tri–State to again amend its complaint to include an action for fraud and deceit. The trial court awarded Tri–State damages of $210,000 for fraud, $544,682.14 in prejudgment interest, and $13,400 for breach of the Apaloosa lease. The trial court also imposed sanctions of $5,500 on Opdahl.

### 1. Was Tri–State the proper party to bring suit?

■ Opdahl claims that Tri–State was not in existence at the time the cause of action arose, and could not be a real party in interest under SDCL 15–6–17(a). The real party in interest rule is satisfied if the "one who brings the suit has a real, actual, material, or substantial interest in the subject matter of the action." *Vander Vorste v. Northwestern National Bank*, 81 S.D.

566, 572, 138 N.W.2d 411, 414 (1965). Although no assignment appears in the record, Hoff conveyed his rights and interests in the silver business to Tri–State, at the time of incorporation in 1981. Tri–State obtained Hoff's right to sue and was the proper party to bring this action. This was not challenged by Opdahl at any time during the trial.

Tri–State, as the named plaintiff in the suit, would be barred from commencing the action again. Likewise, Hoff would be barred from bringing the action as he conveyed his rights to the corporation. "The purpose of a real party in interest provision is to assure that a defendant is required only to defend an action brought by a proper party plaintiff and that such an action must be defended only once." 59 Am. Jur.2d *Parties* § 35 (1987), *see also Wang v. Wang*, 393 N.W.2d 771 (S.D.1986). This purpose is not infringed under the circumstances.

As indicated above, the record reveals that Opdahl failed to object during trial to Tri–State as the real party in interest. SDCL 15–6–17(a) provides in part that:

... No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest;
...

Opdahl had sufficient time to object to Tri–State as the real party in interest and his failure to object constitutes a waiver under our holding.

### 2. Damages for the excessive silver removed by Opdahl.

■ Opdahl initially contends that he could not be liable for conversion as the alleged conversion occurred while he was still owner of the refining business.[2] The

---

**2.** Opdahl raises two arguments to support his claim that he still owned the property at the time the silver was taken. First, he claims that the trial court was clearly erroneous in finding that the April 8 proposal was sufficient to transfer ownership to Hoff in light of the sales and

purchase agreement signed in August. Second, Opdahl contends the trial court erred in finding that Hoff owned one-half of Tri–State at the time of sale. The April 8 proposal, the purchase and sale agreement, and the testimony at trial

record reveals that the trial court based the damage award upon fraud, not conversion. To sustain an action for fraud there need only be a showing of "wilful deception made with the intention of inducing a person 'to alter his position to his injury or risk.'" *Littau v. Midwest Commodities, Inc.,* 316 N.W.2d 639, 643 (S.D.1982) (*citing* SDCL 20–10–1).

■ A claim for fraud and deceit is generally a question of fact for the fact finder. *Laber v. Koch,* 383 N.W.2d 490 (S.D.1986). The trial judge, as finder of fact in this case, found that Opdahl represented that $760,000 in silver was stockpiled at Tri–State. The court based the damage award of $210,000 on Opdahl's representation to hold that amount of silver, as security, until Tri–State paid the bank note. The court found Tri–State detrimentally relied upon this representation by paying the note without receiving the silver from Opdahl. There is sufficient evidence in the record to support these findings.

■ Opdahl argues that the fraud claim is barred by the six-year statute of limitations under SDCL 15–2–13(6). Opdahl correctly asserts that the 1984 complaint failed to state a claim for the silver in that it was based solely upon breach of the Apaloosa lease. The cause of action for the conversion of the silver was pled in August of 1986 and the fraud claim was not pled until trial in 1987. Thus, both causes of action relating to the silver arose more than six years before being pled. However, SDCL 15–2–3 provides:

> In an action for relief on the ground of fraud the cause of action shall not be deemed to have accrued until the aggrieved party discovers, or has actual or constructive notice of, the facts constituting the fraud.

Opdahl claims that Tri–State knew the silver was being taken in 1980, as Clary testified that he notified Hoff each time Opdahl took silver. There is nothing, however, to indicate that Tri–State had notice of the facts constituting fraud. Since the contract provided Opdahl would receive a cer-

tain amount of silver, Hoff would have no reason to suspect fraud based on Clary's phone calls. The trial court so found, and held that Tri–State first learned of the fraud in 1982, as a result of the report by the private investigator. This finding is not clearly erroneous and the fraud claim is not barred by the six-year statute of limitations under SDCL 15–2–3.

■ Opdahl also claims that Tri–State failed to plead fraud with particularity as required by SDCL 15–6–9(b). In *Holy Cross Parish v. Huether,* 308 N.W.2d 575 (S.D.1981), we stated that fraud is sufficiently pled if the pleading party has set out facts indicating that there was a knowing misrepresentation, and that the plaintiff relied upon this falsity. Tri–State's motion to amend its pleadings at the close of the trial alleged that Opdahl made misrepresentations concerning the silver and that Tri–State relied upon these misrepresentations to its detriment. This was sufficient to comply with *Holy Cross Parish.*

■ Finally, Opdahl claims that it was improper for the trial court to permit Tri–State to amend its complaint to include a cause of action for fraud at the close of the evidence. SDCL 15–6–15(b) provides in part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues *may be made upon motion of any party at any time,* ... (emphasis added).

The testimony and other evidence indicates that the removal of the silver was the central issue at trial. Tri–State's proof throughout the trial indicated that Opdahl received or retained silver fraudulently. Opdahl had sufficient opportunity to cross-examine Tri–State's witnesses and present his defense in regard to the issue of fraud. If the opposing party had a fair opportunity to litigate the issue and no additional

support the trial court's findings rather than    Opdahl's claims.

evidence would have been offered, there is no prejudice to the opposing party and an amendment may be granted under SDCL 15–6–15(b) in the trial court's discretion. *Bucher v. Staley,* 297 N.W.2d 802 (S.D. 1980). The issue of fraud was tried by the implied consent of the parties and it was proper for the trial court to allow Tri–State to amend its complaint to conform to the evidence. *Id.*

### 3. *Damages for breach of the lease.*

■ The sales agreement provided that the monthly rent of $200 would remain the same as provided in the prior lease agreement. There is no mention, however, that the lease term of one year should remain the same. Instead, the agreement states that the monthly rental payments should be included in each monthly purchase payment over ten years. While the agreement lacks clarity, it was not error for the court to conclude that it provided for a ten-year lease term.

The trial court awarded damages of $13,400 for breach of the lease. The trial court calculated these damages by awarding Tri–State $200 per month from September 16, 1981, the date the court found Tri–State to have been ousted, until the time of trial. This was a period of five and one-half years.

There is no legal basis to support the trial court's calculation of the lease damages. SDCL ch. 21–2 deals with damages for breach of contract. SDCL 21–2–1 provides:

> For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and their origin.

The trial court failed to make any findings that Tri–State suffered a detriment amounting to $200 per month for five and one-half years and there is nothing in the record to support a damage award in this amount. Monthly rental payments are not the proper measure of damages to the lessee under SDCL 21–2–1.

There is evidence in the record indicating that Tri–State may have suffered a detriment, as it claims it was forced to abandon the Apaloosa property and build replacement facilities at the Sioux Falls location. On remand, the trial court should reconsider the damages from the evidence in the record and determine whether Tri–State suffered any harm proximately resulting from the breach of the lease. If the evidence is sufficient, the trial court should determine the amount of such damages.

### 4. *Imposition of sanctions under SDCL 15–6–11.*

■ The trial court imposed sanctions upon Opdahl in the amount of $2,500, plus attorney's fees and expenses in the amount of $3,000, under SDCL 15–6–11(b). SDCL 15–6–11(b) provides:

> If a pleading, motion or other paper is signed in violation of this rule [SDCL 15–6–11(a)], the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which shall include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion or other paper, including a reasonable attorney's fee.

SDCL 15–6–11(a) states in part:

> ... The signature of an attorney or *party* constitutes a certificate by him that he has read the pleading, motion or *other paper;* that to the best of his knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law ... and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... (emphasis added).

Opdahl and his associates filed numerous papers with the trial court which were clearly frivolous and intended to harass

Tri–State. These papers included orders for summary judgment and dismissal of Tri–State's action, as well as orders purporting to void Judge Connelly's own orders. Notices were issued by Opdahl and his associates which attempted to cancel hearings and trial dates set by Judge Connelly. In addition, a notice of lis pendens was filed against the Hoffs, Tri–State, and one of Tri–State's attorneys in Minnehaha County, for which there was no legal basis. This action required Tri–State to commence an action to set aside the lis pendens in Minnehaha County. Opdahl also filed two lawsuits in federal court against Tri–State, Judge Connelly, and others, which were dismissed as meritless. These actions reflect an intent to harass and bad faith on the part of Opdahl and his associates. The orders and notices filed in Judge Connelly's court qualify as pleadings or *other papers* intended to harass under SDCL 15–6–11(a).

The question remaining is whether the trial court erred in determining the amount of sanctions imposed under SDCL 15–6–11(b). Under 15–6–11(d) "The Supreme Court shall consider all appeals pursuant to this seciton without any presumption of the correctness of the trial court's findings of fact and conclusions of law." *Cheek v. Doe*, 828 F.2d 395 (7th Cir.1987), involved Rule 11 sanctions against a *pro se* litigant for frivolous pleadings under the abuse of discretion standard. The court held that Federal Rule 11 permits the imposition of a pure "penalty" sanction where there is obvious bad faith and intent to harass. The *Cheek* court reduced an $11,500 penalty sanction to $5,000, stating:

> Nor do we intend to suggest in any way that $5,000 is to be routinely or regularly imposed in similar cases, whether *pro se* or not. . . . But we also hasten to add that we reserve the right in the future to approve the assessment of whatever damages may become necessary to protect the judicial system against serious abuse, should the public interest demand.

*Cheek, supra* at 398. The trial court awarded a pure sanction of $2,500 against Opdahl. In view of Opdahl's serious abuse and mockery of the judicial system, we cannot say that the trial court erred in imposing a penalty sanction in that amount.

The trial court also imposed $3,000 in sanctions for attorney fees and other expenses resulting from Opdahl's violation of SDCL 15–6–11(a). The court based this amount on the billings submitted by Tri–State's attorney. Included in these billings were fees and expenses which related to the Minnehaha County and federal court actions. A separate motion for sanctions is pending in the federal court action. In reviewing these billings, we are satisfied that Judge Connelly reduced the amount to $3,000 to reflect only those fees and expenses Tri–State incurred because of Opdahl's actions in Judge Connelly's court. Therefore, sanctions of $5,500 were proper.

### 5. Compound prejudgment interest.

■ The trial court awarded $544,682.14 in prejudgment interest to Tri–State on fraud damages of $210,000. Opdahl contends that this award was improper because damages must be certain or capable of being made certain under SDCL 21–1–11 to award prejudgment interest. Opdahl's reliance on SDCL 21–1–11 is misplaced. The prejudgment interest award was based on a tort claim of fraud. SDCL 21–1–13 provides, "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury." The trial judge was the fact finder in this case and could properly award prejudgment interest for fraud damages in his discretion. *Winterton v. Elverson*, 389 N.W.2d 633 (S.D.1986).

Finally, Opdahl claims that the trial court erred in compounding prejudgment interest.[3] Tri–State provides no authority for its argument that compounding prejudgment interest was proper. Opdahl submits

---

**3.** Apparently, the trial court calculated prejudgment interest from the time the fraud arose in 1980 until the time of trial in 1987. The interest rates for prejudgment interest during this period of time ranged from 12% to 18%. Based on damages of $210,000, it is obvious that, at a minimum, the trial court compounded interest during this period in order to reach a figure of $544,682.17 for prejudgment interest.

SDCL 21–1–11 and SDCL 21–1–13 should be read in conjunction with SDCL 54–3–3, which provides: "When a rate of interest is prescribed by a law or contract, without specifying the period of time by which such rate is to be calculated, it is to be deemed an annual rate." Opdahl also claims *Northern Improvement Co. v. South Dakota State Highway Commission,* 314 N.W.2d 857 (S.D.1982), is controlling because of the interest rates approved therein. We do not find it to be controlling. Whether interest may be compounded under SDCL 21–1–13 has not previously been addressed by this court. The language of the statute provides little guidance on the question. It should be noted, however, that SDCL 21–1–11 provides that every person entitled to recover damages "is entitled also to recover interest thereon from that day." The statute allows interest to be recovered *thereon* which refers back to damages. This language appears to allow the recovery of interest on damages but not interest on interest. There is no reason to calculate interest differently under SDCL 21–1–13 than under SDCL 21–1–11. Thus, it was improper for the trial court to compound the interest. On remand, the trial court should recalculate the amount of prejudgment interest under SDCL 21–1–13 using simple interest.

The judgment of the trial court is affirmed in part, reversed in part, and remanded for a redetermination of damages for breach of the lease and recalculation of prejudgment interest.

All the Justices concur.