Charles L. TAGGART and Charlotte M. Taggart, Plaintiffs and Appellants,

v.

FORD MOTOR CREDIT COMPANY, and Ford Motor Company, Defendants and Appellees.

No. 16857.

Supreme Court of South Dakota.

Argued March 19, 1990.

Decided Oct. 31, 1990.

Rick Johnson of Johnson, Eklund & Davis, Gregory, for plaintiffs and appellants.

Steven W. Sanford of Cadwell, Sanford & Deibert, Sioux Falls, for appellee Ford Motor Credit Co.

Edward J. Pluimer and Edmund J. Kelley of Dorsey & Whitney, Minneapolis, Minn., for appellee Ford Motor Co.

MORGAN, Justice.

This appeal arises from an action commenced by Charles L. Taggart (Taggart) and Charlotte M. Taggart (collectively referred to as Taggarts) against Ford Motor Company (Ford) and Ford Motor Credit Company (Ford Credit) following the financial failure of Sioux Falls Ford Tractor, Inc. (SFFT), a farm machinery and implement dealership, franchisee of Ford and debtor to Ford Credit. The action was commenced on two counts, one of intentional concealment and the other for negligent failure to disclose. The trial court granted summary judgment on both counts and this appeal followed. We affirm.

### FACTS

The focus of this lawsuit is an agreement designated a "Stock Redemption Agreement," guaranteed by Taggart, whereby SFFT purchased its corporate stock then owned by Vertus Rohrer (Rohrer), president and majority shareholder, coupled with Taggarts' agreement to purchase sufficient stock in SFFT to acquire an equal interest in the corporation with Gerald Bertsch (Bertsch), secretary, treasurer and minority stockholder.[1] Negotiations on this transaction commenced in late 1979. At that time, SFFT was solely owned by Rohrer and Bertsch and had been since 1974.

The negotiations between Bertsch and Taggart and their attorney, Vance Goldammer (Goldammer), and Rohrer and his attorney, Richard Cutler (Cutler), planned that the corporation would purchase Rohrer's stock and Taggarts would buy sufficient shares to match those already held by Bertsch. The "Stock Redemption Agreement" released Rohrer from all corporate liability as well as all personal guarantees to insure payment of the corporation's debts. As one of the conditions precedent to the closing, the agreement required approval by Ford and Ford Credit, and the renewal of SFFT's franchises. Neither Ford nor Ford Credit were signatories to the "Stock Redemption Agreement" or participated in the negotiations. The transaction, negotiated between Taggarts, Rohrer and Bertsch, and their respective counsel, came to fruition and the agreement was signed on February 1, 1980. Since what was known and communicated by the parties about the financial condition of SFFT is the key to whether a material issue of fact exists, it is useful to recount how and

---

1. Other documents were executed by the parties in compliance with and in furtherance of the provisions of the Stock Redemption Agreement.

when Taggarts came to the decision to sign the "Stock Redemption Agreement."

The record reflects in deposition testimony that as early as December 13, 1979, at a meeting between Bertsch, Taggart and Goldammer regarding the structure of the stock transaction, Goldammer observed that his client Taggart had already decided to invest in SFFT. Even Taggart himself conceded that by January 5, 1980, the date that Goldammer sent a letter to Rohrer's attorney proposing the terms of the "Stock Redemption Agreement," Taggart had made up his mind to purchase the SFFT stock and that the deal was set. At the time of Taggart's decision, neither he nor Goldammer made any effort to contact or to seek any information from Ford or Ford Credit regarding SFFT.

While Ford and Ford Credit did not supply Taggarts with financial information about SFFT before their decision to complete the deal, many other people did. During the course of the stock negotiations, Taggart met with Rohrer and Bertsch on numerous occasions. At all of these meetings, Taggart and the others discussed SFFT's business, its financial state, its inventory, and its cash-flow situation. In addition, Taggart received financial statements of SFFT, which he reviewed with both Bertsch and Goldammer. Of particular importance, Taggart received a financial report regarding SFFT, prepared by the accounting firm of McGladrey Hendrickson and Co., showing contingent liabilities of more than $1 million.

Taggarts' *only* contact with Ford came on January 24, 1980, well after Charles Taggart had made his decision to become co-owner of SFFT. David Coady (Coady), a Ford sales manager, met with Taggarts in order to obtain their signatures on several documents necessary to the change in the franchise for SFFT. These included a Continuing Guaranty in which Taggarts, together with Bertsch and his wife, personally guaranteed to Ford Credit payment of all SFFT indebtedness. Additionally, Taggarts signed a Dealership Application transferring the franchise into the names of Bertsch and Taggarts. Though these documents contained some financial information about SFFT, all these documents were prepared by Taggarts and Bertsch, not by Ford or Ford Credit. This meeting held so little importance to Charles Taggart that he described it as follows:

I never dealt with any representatives of Ford Motor Company. I do recall Mr. [Coady] bringing some papers and asking for my signature and the signature of my wife out at the dealership. I heard his testimony in Sioux Falls and would agree that I do not think that I would have remembered Mr. [Coady] either. Our meeting was very brief. I think he just said he had documents that had to be signed to get the franchise changed over.

In 1986, some six years after the transaction, SFFT collapsed under the weight of financial problems, and Taggarts instituted a tidal wave of litigation. Taggarts first sued Gerald Bertsch for more than $597,-000.00, asserting, *inter alia,* that Bertsch had diverted company funds and assets for personal use, defrauded Taggarts, and engaged in misconduct resulting in SFFT's business failure. Taggarts then instituted this suit with claims of fraud and nondisclosure against Rohrer (now deceased) and Ford Credit; Ford was later named as a defendant. Finally, when SFFT's bank, the First National Bank in Sioux Falls, brought suit against Taggarts on their guaranty of SFFT's debt to the Bank, Taggarts responded by suing the Bank, and the suit against the Bank was consolidated with this action. Bertsch ultimately consented to a judgment against himself and the claims against the Bank and the Rohrer estate have been settled and dismissed. The only defendants remaining are Ford and Ford Credit.

Taggarts' complaint asserted two causes of action against Ford and Ford Credit. The first count alleged intentional and bad faith concealment by Ford and Ford Credit of information that SFFT was in desperate financial condition at the time that Taggarts signed the guarantees of all indebtedness owed by SFFT to Ford Credit. They also sought exemplary damages on this

count. The second count alleged negligent failure to disclose to Taggarts negative information concerning the SFFT financial condition, which omission they allege to be a representation on which Ford and Ford Credit knew that Taggarts would rely in making their decision to invest in SFFT. After the trial court granted Ford's and Ford Credit's respective motions for summary judgment, Taggarts appealed.

## ISSUES

1. Did the trial court err in granting summary judgment in favor of Ford and Ford Credit on the claim of intentional concealment? We hold that it did not.

2. Did the trial court err in granting summary judgment in favor of Ford and Ford Credit on the claim of negligent concealment? We hold that it did not.

## ANALYSIS

We first note our standard of review in review of orders granting summary judgment:

In reviewing a grant or a denial of summary judgment under SDCL 15–6–56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the non-moving party and reasonable doubts should be resolved against the moving party. The non-moving party, however, must present specific facts which demonstrate a genuine, material issue for trial. When no genuine issue of fact exists, summary judgment is looked upon with favor and is particularly adaptable to expose sham claims and defenses. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.

*Wang v. Wang,* 447 N.W.2d 519, 521 (S.D. 1989) (citations omitted). Further, we recognize that claims of fraud and deceit are usually jury questions. *Tri–State Refining v. Apaloosa Company,* 431 N.W.2d 311, 314 (S.D.1988). But, allegations of fraud and deceit without specific material facts to substantiate them will not prevent summary judgment. *Western Cas. & Sur. Co. v. Gridley,* 362 N.W.2d 100, 102 (S.D. 1985). Summary judgment is "usually not appropriate in negligence actions because the standard of a reasonable [person] must be applied to conflicting testimony. If, however, the facts are undisputed, the issue becomes one of law for this court to decide." *Gasper v. Freidel,* 450 N.W.2d 226, 229 (S.D.1990) (citations omitted).

We also note that SDCL 15–6–52(a) provides that findings of fact and conclusions of law are unnecessary when the trial court rules on a motion for summary judgment. "Since a summary judgment presupposes there is no genuine issue of fact, findings of fact and conclusions of law are unnecessary." *Wilson v. Great N. Ry.,* 83 S.D. 207, 211, 157 N.W.2d 19, 21 (1968) (footnote omitted). Because the trial court made findings of fact and conclusions of law, Taggarts argue that there must have been genuine material facts in issue. We disagree. Occasionally, trial courts find it desirable to state briefly the basis for a summary judgment to provide parties with the reasons supporting the decision, and to provide for meaningful appellate review. This action, sometimes accomplished by means of memorandum opinion or by incorporating some findings in the body of the order, does not signify contested material facts. 5A Moore's Federal Practice ¶ 52.08 (1989); *see Gaines v. Haughton,* 645 F.2d 761, 768 n. 13 (9th Cir.1981); *Hanson v. Aetna Life & Cas.,* 625 F.2d 573, 575 (5th Cir.1980); *Tygrett v. Washington,* 543 F.2d 840, 844 n. 17 (D.C. Cir.1974).

In all orders granting summary judgment in this case, the trial court incorporated in its decision wording that: "it appears to the Court that there is no genuine issue of material fact as to the following...." The orders then list the facts that the trial

court found undisputed,[2] which formed the basis for its conclusions that summary judgment was proper. We note that these orders indicate what the trial court understood to be the undisputed material facts; as such, they are helpful for appellate review. *See Tygrett, supra.* However, in reviewing a grant or denial of summary judgment, "we are not bound by the factual findings of the trial court and must conduct an independent review of the record." *Koeniguer v. Eckrich,* 422 N.W.2d 600, 601 (S.D.1988). With these standards in mind, we now turn to the issues presented by this appeal.

### 1. Intentional Concealment.

The first issue alleging intentional concealment centers on the provisions of SDCL ch. 20–10, Liability for Deceit. SDCL 20–10–1 provides that "[o]ne who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Taggarts have based their claim of intentional concealment on the language of SDCL 20–10–2(3), which describes one of the acts constituting deceit within the meaning of SDCL 20–10–1 as "[t]he suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead *for want of communication of that fact*[.]" Simply put, to avoid summary judgment, Taggarts must show that a genuine issue exists regarding one of two things: (1) Ford or Ford Credit owed a duty to Taggarts that required them to reveal negative financial information about SFFT, or (2) Ford or Ford Credit provided information or facts to Taggarts which mis-

led them into making the Stock Redemption Agreement and purchase of SFFT. We will examine each allegation separately.

On the issue of duty to disclose, Taggarts point to numerous facts known by Ford and Ford Credit about the shaky financial condition of SFFT that were not communicated to them and argue that they preclude summary judgment on the willful deceit issue.[3] Even granting that all these facts are uncontested, they do not prevent summary judgment because they are not *material* facts. These facts would become material only if Ford or Ford Credit owed a duty to Taggarts, and they do not. Our statutes and case law explain why.

The first clause of SDCL 20–10–2(3) imposes liability for suppression of a fact only on *"one who is bound to disclose"* the fact. This court has never imposed a duty to disclose information on parties to an arm's-length business transaction, absent an employment or fiduciary relationship. *Voeller v. Geisler,* 77 S.D. 96, 86 N.W.2d 395 (1957). *Voeller* affirmed the dismissal of a complaint which alleged fraudulent nondisclosure. We noted:

> [The complaint's] sole purpose appears to be to express *the erroneous assumption* that defendants were under [a] duty to volunteer to plaintiff the fact that they were receiving a broker's commission. Giving plaintiff's evidence full credence it does not show plaintiff's employment of defendants, or that there was a fiduciary relationship between them.

77 S.D. at 100–101, 86 N.W.2d at 398 (emphasis supplied). Cases where this court has found a duty to disclose have all involved an employment or fiduciary relation-

---

2. The undisputed material facts, as found by the trial court were:

> *Taggart, with the assistance of counsel,* negotiated and entered into an agreement with Rohrer, et al., subject to later approval by defendants, who were not parties to the agreement.
>
> Taggart made no effort to secure information from defendants.
>
> *Neither defendant made any representations to Taggarts.*
>
> Defendants had no fiduciary, employment, confidential or other relationship creating a legal duty on the part of defendants to dis-

close to plaintiffs any facts, opinions or information available to defendants.

3. These include the following: that SFFT sold over $111,158.07 worth of floor-planned units out of trust; that SFFT's credit was suspended temporarily in 1978 and 1979 because of excessive debt; that profits were overstated by $10,-000 in 1978; that used equipment was too large a part of inventory and was overvalued; and, that by 1979, the Dealership Analysis showed the business was very cash poor, that risk was above average, and the effective guaranty was minimal.

ship. *Zee v. Assam*, 336 N.W.2d 162, 165 (S.D.1983) (real estate broker/client); *Brenden v. Anderson*, 327 N.W.2d 136, 140 (S.D.1982) (partnership); *Hurney v. Locke*, 308 N.W.2d 764, 769 (S.D.1981) (real estate broker/client); *Golden v. Oahe Enterprises, Inc.*, 295 N.W.2d 160, 164 (S.D.1980) (incorporator/shareholders).

 It is undisputed that no employment relationship existed between Taggarts and Ford or Ford Credit. Thus, if either Ford or Ford Credit is subject to the duty to disclose under the first clause of SDCL 20–10–2(3), Taggarts must attempt to characterize the business relationship as a fiduciary one. SDCL 55–7–2(2) provides the applicable definition of "fiduciary" for purposes of determining when the duty under SDCL 20–10–2(3) arises. *See* SDCL 2–14–4 (statutory definitions used in one chapter are applicable to the same word or phrase wherever such word or phrase occurs). SDCL 55–7–2(2) defines a fiduciary as:

> [A] trustee under any trust, express, implied, resulting or constructive, executor, administrator, guardian, conservator, curator, receiver, trustee in bankruptcy, assignee for the benefit of creditors, partner, agent, officer of a corporation, public or private, public officer, or any other person acting in a fiduciary capacity for any person, trust or estate.

The examples of fiduciaries listed in SDCL 55–7–2(2) reflect the traditional view that fiduciary duties are not inherent in normal arm's-length business relationships, and arise only when one undertakes to act primarily for another's benefit. The law will imply such duties only where one party to a relationship is unable to fully protect its interests and the unprotected party has placed its trust and confidence in the other.

 The position of Ford and Ford Credit relative to Taggarts is not analogous to any of the examples of fiduciaries in SDCL 55–7–2(2). Nor does the relationship between Ford or Ford Credit and Taggarts come within the traditional definition of a fiduciary relationship. Taggart is an experienced businessman capable of taking adequate precautions to protect himself in his business transactions. Indeed, he took an additional precaution by hiring able counsel to represent him in negotiating, structuring, and documenting his investment in SFFT. Ford and Ford Credit did not owe Taggart a duty to protect his interests.

 Taggarts' observation that an ongoing relationship between SFFT and Ford and Ford Credit was necessary to the dealership is insufficient to make the relationship between franchisor and franchisee, or between dealership and financing company, a fiduciary relationship. The one brief and easily forgotten (by Taggart) contact between Taggarts and a representative from Ford, after Taggart had already decided to do the deal, is hardly sufficient to create a fiduciary relationship. This is particularly true where Taggarts were represented by their lawyer, requested no information or advice from Ford or Ford Credit, and where neither Ford nor Ford Credit was even a party to the transaction at issue. It is inconceivable that a fiduciary relationship could arise in such a situation.

 Nor do we find a fiduciary relationship created by the fact that Taggarts signed as guarantors of the debt owed to Ford Credit by SFFT. A guaranty creates nothing more than a contract to pay the debt of another. *Western Petroleum Co. v. First Bank of Aberdeen*, 367 N.W.2d 773 (S.D.1985); SDCL 56–1–1. Other jurisdictions examining this issue have held that a guaranty does not create a fiduciary relationship. *First National Bank & Trust Co. v. Notte*, 97 Wis.2d 207, 293 N.W.2d 530 (1980); *Sumitomo Bank of California v. Iwasaki*, 70 Cal.2d 81, 73 Cal.Rptr. 564, 447 P.2d 956 (1968). We agree with the reasoning of these courts.

 Similarly, we do not find a fiduciary relationship created by the power of attorney granted by Taggarts to Ford merely to carry on normal franchise business such as making promissory notes, chattel mortgages, and conditional sales contracts. The obvious purpose of the power of attorney was to facilitate direct payment to inventory sellers to avoid the necessity of the signature of a separate note for each such occasion. As we noted

in *Groseth International Inc. v. Tenneco*, 410 N.W.2d 159 (S.D.1987), there is no fiduciary duty created by such franchise relationships.

▮ Finally, on this issue, Taggarts rely on the Restatement (Second) of Torts to support their claim that they would have never purchased the SFFT stock and consequently would have never guaranteed SFFT's debt to Ford Credit if Ford or Ford Credit had disclosed to Taggarts all of their financial information regarding SFFT. However, a necessary element of each section of the *Restatement* that Taggarts cite is that the person or entity concealing information must be a *party* to the transaction. *Restatement* § 550 reads as follows:

> *One party to a transaction* who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering. (Emphasis added.)

*Restatement* § 551(2) imposes a duty to disclose only on parties to a transaction:

> (2) *One party to a business transaction* is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,.... (Emphasis added.)

It is undisputed that neither Ford nor Ford Credit was a party to the Stock Redemption transaction. Accordingly, Ford and Ford Credit were not subject to a duty to disclose under the first clause of SDCL 20–10–2(3).

The second aspect of SDCL 20–10–2(3) imposes liability for suppression of a fact if there was a partial disclosure which, without disclosure of the concealed information, misleads the plaintiff. Taggarts allege that (1) applications they made to Ford and Ford Credit, and (2) an opinion given by Ford sales manager Coady to Bertsch, and then related by Bertsch to Taggart, contained information that misled Taggarts into making the Stock Redemption Agreement and to purchasing SFFT stock, thus triggering this provision.

In regard to the first theory, Taggarts argue that the information contained in applications that *they and Bertsch submitted to Ford and Ford Credit* constituted a misrepresentation, and that they relied on this misrepresentation to their detriment. These applications consisted of an application to Ford for dealership transfer and a guaranty of indebtedness made to Ford Credit. Though it was Taggarts and Bertsch who submitted these forms, Taggarts argue that it was the duty of Ford or Ford Credit to correct any data that they knew was inaccurate and to notify Taggarts of such inaccuracies before they accepted these applications. Specifically, Taggarts claim that the applications which they submitted did not reveal that out-of-trust sales had been made by SFFT in 1978 and that SFFT had contingent liabilities of $400,000.

▮ Though Taggart claimed that he had no knowledge of these facts at the time he agreed to purchase SFFT, Taggart admitted that he received financial reports from SFFT's accountants showing liabilities of at least $1 million. Further, the out-of-trust sales had been paid down to $13,500 when Taggart renewed his larger note with First National Bank. It seems almost painfully obvious that Ford and Ford Credit cannot be charged with providing misinformation on documents that were submitted *to them*, even if an employee of Ford brought them to Taggart for his signature. Even assuming, as Taggarts allege, that much of the dealership transfer application was blank when they signed it, and that Ford typed in portions of the information after Taggarts signed and submitted the application, Taggarts' claim fails. It is logically impossible for Taggarts to have been misled by information that was typed onto the application *after* it was submitted to Ford for approval.

Moreover, the dealership application that Taggarts claim contains the misrepresentations also contains the following clear caveats:

> Any ... investments ... made by me/us [applicants Taggart and Bertsch] in anticipation of the acceptance of this appli-

cation are done solely on my/our own responsibility and do not obligate you [Ford] or any representatives in any way. I/we admit that no representations or statements have been made to me/us in your behalf ... that I/we are relying on as an inducement to execute this application. ...

It is also understood ... that you make no representation or guaranty as to the profitability or success of the proposed dealership venture, and that my/our investment therein is made at my/our risk.

This application clearly warned Taggarts that it was not to be relied on for investment purposes. More importantly, any alleged misrepresentation in the documents was made *to* Ford and Ford Credit by Taggart and Bertsch, not vice-versa.

█ In addition, another element of the claim of intentional concealment under SDCL 20–10–1 is detrimental reliance. Taggarts must be able to demonstrate that a genuine issue exists regarding their reliance on the information contained in the applications submitted to Ford or Ford Credit. Considering Taggart's prior testimony and sworn statements, however, it is clear that he placed no reliance on the Ford documents and made his decision to invest in SFFT before he submitted the information. Addressing whether he had ever asked for or received any information from Ford and Ford Credit, Taggart testified at his deposition as follows:

Q: Do you know whether he [Vance Goldammer, Taggart's attorney in the transaction] inquired at all of the Ford Tractor Division people about their opinion of this dealership?

A: That, I would have no idea, sir.

Q: Did you, prior to closing?

A: I never talked to anybody from the Ford franchise or Ford Motor Credit.

.　　.　　.　　.　　.

Q: Did you call or write anyone at Ford Tractor Division or Ford Motor Credit prior to closing and ask them anything about Sioux Falls Ford Tractor, Inc.?

A: Not that I know of, no. ...

Further, in answers to interrogatories, Taggart stated the following as to requesting or being provided any information from Ford or Ford Credit:

The only documents that I can recall reviewing prior to becoming a shareholder in the company were the in-house financial statements for October and December of 1979 [of SFFT], which were shown to me by Mr. Rohrer. Since I had no reason to question the validity of the financial figures shown to me or to otherwise question the soundness of my investment, I did not request any information from Ford Motor Company.

The event when the Ford documents were signed by Taggart was so uneventful that he at first forgot it during his deposition. When he did recall his only contact with Ford, he described it as a "very brief" meeting to sign "documents ... to get the franchise changed over." Yet, these are the documents that Taggart claims he relied on to make his investment in SFFT. This is a matter about which different minds could reach only one conclusion: Taggarts could not have relied on the information from Ford and Ford Credit since Taggart signed the documents and entered into the agreement to purchase SFFT stock without requesting or reading any information from Ford or Ford Credit. Accordingly, the documents that Taggart supplied to Ford and Ford Credit cannot form a genuine issue of material fact preventing summary judgment.

█ Nor are we dissuaded from this position by Taggart's "eleventh-hour" affidavit submitted to prevent summary judgment. In this affidavit, Taggart claims that he relied on the application for dealership change and that he believed that Ford had done a credit check of SFFT, that the application he submitted would have accurate figures as to contingent liabilities of SFFT, and that Ford would never approve this application unless the dealership financial affairs met all their standards. Rather than a statement of material facts, Taggart's affidavit was a recitation of assumptions and suppositions.

In *Camfield Tires Inc. v. Michelin Tire Corp.*, 719 F.2d 1361 (8th Cir.1983), the court was quick to pierce the ruse of a contradictory affidavit submitted for the purpose of creating a material issue of fact when there was no explanation for the change in testimony from the deposition to the affidavit. Echoing our sentiment, the Eighth Circuit said:

> If testimony under oath, however, can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment. A party should not be allowed to create issues of credibility by contradicting his own earlier testimony.

*Id.* at 1365–66. *See Babrocky v. Jewel Food Co. & Retail Meat Cutters*, 773 F.2d 857 (7th Cir.1985); *Nutt v. A.C. & S. Co., Inc.*, 517 A.2d 690 (Del.Supr.1986) *aff'd, Mergenthaler v. Asbestos Corp of America*, 480 A.2d 647 (Del.Supr.1984). Likewise, barring an explanation for his change in testimony or a showing that his answers were ambiguous and the affidavit clarified them, Taggart's affidavit did not create a material issue of fact. *Camfield, supra; Babrocky, supra; Nutt, supra.*

■ Turning then to the second theory, Taggarts claim that opinions ventured from Ford sales manager Coady to Bertsch form the basis of misrepresentation. Taggarts allege that statements solicited by Bertsch from Coady as to Coady's opinion about the stock redemption and purchase transaction were misrepresentations of fact. The uncontradicted evidence is that in response to Bertsch's inquiry, Coady observed that the price for the business *"might* be reasonable" and that the stock price was *"probably ...* book value or close to it." As to Ford, Coady's *opinions* simply cannot form the basis for misrepresentation. Under our case law, we have said that opinions such as those expressed by Coady cannot form the basis for fraud. *Todd v. Winkelman*, 320 N.W.2d 525, 529 (S.D.1982) ("'sellers' statements that the saloon would generate sufficient income were, at best, puffing"); *Aschoff v. Mobile Oil Corp.*, 261 N.W.2d 120, 124 (S.D.1977) (the mere expression of an opinion would not be a representation of a material fact).

■ Furthermore, Comment d to Restatement (Second) of Torts § 533 only imposes liability on a person who makes a representation through a third party if the maker of the representation "make[s] the misrepresentation with th[e] intent [that it be repeated to a third party for the purpose of influencing conduct], or must have information that gives him special reason to expect that it will be communicated to others, and will influence their conduct." As the record reflects, Taggarts have presented no evidence whatsoever to show Coady made the alleged comments to Bertsch with the intent or expectation that Bertsch would repeat them to Taggarts, and with the further intent or expectation that his off-the-cuff expressions of opinion would materially influence Taggarts' conduct. Taggarts mere allegations are not enough to prevent summary judgment. *Dirks v. Sioux Valley Empire Elec. Ass'n*, 450 N.W.2d 426 (S.D.1990).

■ It almost goes without saying that the *opinions* expressed by a Ford employee cannot be attributed to Ford Credit, absent a showing that the separate corporate status should be disregarded. Though Taggart argues that he never distinguished between the two entities, Taggart's subjective mistake that Ford and Ford Credit were the same corporate entity is insufficient as a matter of law to make the opinions of a Ford employee the basis for liability of Ford Credit. *See Midcontinent Broadcasting Co. v. Ava. Corp.*, 329 N.W.2d 378, 381 (S.D.1983) ("The mere identification of a subsidiary without more information is insufficient to reach the conclusion that the subsidiary is the alter ego of the parent.").

■ Further, the mere fact that Coady had Taggarts sign guaranties for Ford Credit does not impute his opinions to Ford Credit. Most importantly, Taggarts never raised at trial the contention that Coady was acting on behalf of Ford Credit; therefore, Taggarts have waived their right to do so on appeal. *Jones v. Sully Buttes Schools*, 340 N.W.2d 697 (S.D.1983).

■ Finally, on a practical level, any factual information relayed to Taggart

would have come from Bertsch. Bertsch, as one of two owners of SFFT, worked full-time at the business, and was its treasurer. Taggart believed that Bertsch knew how to run the entire SFFT operation. Obviously, Bertsch knew a lot more about SFFT's business than Coady did, and Coady told him so. Consequently, any *factual* representations that Bertsch made to Taggarts were based on Bertsch's own knowledge of SFFT, not on Coady's comments to Bertsch expressing Coady's opinion about Bertsch's own company. Thus, Bertsch's factual statements to Taggart cannot support the claim that Ford made representations of fact to Taggarts.

The record supports the trial court's findings and demonstrates that no representations were made to Taggarts by Ford and no fiduciary or employment relationship existed between Taggarts and Ford or Ford Credit. Thus, it was proper for the trial court to conclude that Ford and Ford Credit were under no duty to disclose to Taggarts financial information as a matter of law. The cases cited by Taggarts are inapplicable. The trial court properly granted summary judgment on the first cause of action.

## 2. Negligent Concealment.

 We turn next to the second cause of action predicated on the theory of negligent failure to disclose. Although South Dakota recognizes actions for negligent misrepresentation, there is no cause of action for negligent nondisclosure. *See Littau v. Midwest Commodities, Inc.*, 316 N.W.2d 639 (S.D.1982). Taggarts have based their claim on our decision in *Moore v. Kluthe & Lane Insurance Agency, Inc.*, 89 S.D. 419, 234 N.W.2d 260 (1975). That decision is clearly distinguishable from the facts presented in this case. *Moore* involved misrepresentations by an insurance agent as to what the policy covered. We approved only a cause of action for negligent misrepresentation, *not* negligent nondisclosure, and then only if " 'the other giving the information owes a duty to give it with care.' " 89 S.D. at 426, 234 N.W.2d at 264 (citation omitted). As was discussed above, there was no duty to disclose information.

The case of *Merrill Lynch, Etc. v. Boeck*, 127 Wis.2d 127, 377 N.W.2d 605 (1985), cited by Taggarts does not persuade us to abandon our settled law. *Boeck* stands only for the proposition that if a broker volunteers information, i.e., makes a partial disclosure, then the information disclosed must be accurate and complete. The Wisconsin court pointed out that there was no *a priori* duty of a broker to disclose.

> For the purpose of clarification at the new trial, we note that a broker does not have an *a priori* duty to disclose known and relevant information about investments contemplated by a customer. The broker may simply transact the customer's purchase or sell orders without making any representations. The broker's duty *may change*, however, *if he volunteers information that he was not otherwise obligated to provide.* He may not give such information negligently. *If such initial information is given*, the broker then has a duty to disclose subsequently acquired information that he knows will make a previous representation erroneous or misleading.

*Id.* 377 N.W.2d at 612 (emphasis added). Consequently, *Boeck* does not support Taggarts' claim for a new cause of action for negligent nondisclosure.

### DECISION

Therefore, inasmuch as Ford and Ford Credit owed no duty to disclose financial information to Taggarts as a matter of law, the trial court properly granted Ford and Ford Credit summary judgment on Taggarts' claim of intentional concealment. Also, because South Dakota does not recognize a cause of action for negligent concealment, the trial court properly granted summary judgment to Ford and Ford Credit on Taggarts' second claim.

The decisions of the trial court are affirmed.

All the Justices concur.